v.

**ADOPTION CHOICES OF COLORADO, INC., Appellee,**

and

**T.W. and A.W., Intervenors–Appellees.**

Court of Appeals No. 13CA2280

Colorado Court of Appeals.

Announced November 20, 2014

Lasher Legal Resolution, P.C., S. Scott Lasher, Kelly L. Snodgrass, Denver, Colorado, for Appellant.

Catherine A. Madsen, P.C., Catherine A. Madsen, Westminster, Colorado, for Appellee.

Berenbaum Weinshienk PC, Rajesh K. Kukreja, Denver, Colorado, for Intervenors–Appellees.

Opinion by JUDGE GRAHAM

¶ 1 M.C. (father), the biological father of twins A.H.Z. and V.D.Z. (children), appeals from the judgment terminating the parent-child legal relationship between him and the children, and awarding permanent legal custody of the children to T.W. and A.W. (inter-venors). We reverse the judgment and remand the case for further proceedings.

## I. Background

¶ 2 On September 13, 2012, J.Z. (mother) gave birth to the children in Grand Junction, Colorado. The next day, she completed a petition for expedited relinquishment of her parental rights pursuant to section 19–5–103.5, C.R.S.2014. She also completed supporting documents, including an affidavit and declaration of paternity. She provided a first name for the children's father, but alleged that she did not know his last name, his address, his telephone number(s), the name of his employer, or other information that might have been used to locate him. A few days later, the documents were filed in the district court of Clear Creek County, Colorado. At the same time, petitions to terminate the parent-child legal relationship between father and the children were filed by Adoption Choices of Colorado, Inc. (Adoption Choices), a licensed child placement agency. Adoption Choices alleged that on August 24, 2012, father and any and all other unknown birth fathers had been given notice of the anticipated relinquishment by publication in the Denver Business Journal, a publication in Denver County, Colorado, where the conception had allegedly taken place and where mother allegedly resided. There had been no response to the notice.

¶ 3 Intervenors, who were clients of Adoption Choices, were selected by mother to be the children's adoptive parents. Intervenors were allowed to be present for the children's birth, and, on the day of their birth, Adoption Choices placed the children with them. Under the terms of the placement agreement, intervenors acknowledged "the uncertainties associated with predicting ... whether birth parents' rights will be terminated" and specifically acknowledged that Adoption Choices was relying on information from the birth mother as to the birth father's identity, and, if that information was incorrect, the birth father might have a claim to the children in the future. Intervenors also entered into (1) a temporary custody agreement, under which they acknowledged that problems might arise, including but not limited to claims by

the birth parents, and that the placement of the children did not ensure that the adoption would proceed to finalization; (2) legal risk agreements for the children, under which they chose to accept immediate custody of the children, knowing that there was a legal risk that the children could be removed from their home due to "contested matters" in the adoption, rather than allow the children to be placed in a transitional home until all potential barriers to finalization of the adoption had been removed; and (3) a service agreement, under which they acknowledged that an adoption placement presents risks that might or might not be known to them, that a child is not legally available for adoption until a court order is entered legally divesting the birth parents of their parental rights, and that even after termination of the birth parents' rights, they could change their minds about the adoption *if fraud or duress existed.*

¶ 4 Because father had not responded to notice of the children's birth—notice that had been given to him by publication—his legal relationship with the children was terminated on September 21, 2012. The final decree of adoption was entered on December 27, 2012.

¶ 5 In February 2013, father appeared and sought relief from the judgment terminating his parental rights pursuant to C.R.C.P. 60(b)(2). He alleged that he and mother had met in October 2011 and had a long-distance dating relationship for approximately six months; mother had told him that she was pregnant in January 2012; and he and mother had arranged for her to relocate from her home in Grand Junction to his home in Des Moines, Iowa, so that they could live together during the pregnancy. He stated that she had moved to Des Moines in March 2012, but, about one week before the move, she told him that she had experienced a miscarriage. Shortly after moving in with him, she moved back to Grand Junction, stating that she was homesick, and thereafter, they ceased dating and had minimal contact with one another. He stated that he believed that mother had lost the pregnancy and did not discover mother's deception until December 18, 2012, when a friend told him that mother had given birth to twin boys and then given them up for adoption, representing to the

court and to the adoptive parents that she did not know who the father was. Arguing that the order terminating his parental rights was void because of mother's fraud upon the court, father asked the court to grant him relief from the judgment and full custody of the children.

¶ 6 Intervenors sought and were granted leave to intervene in the proceeding. They opposed father's motion, arguing in part that even if father could prove the existence of fraud, the court should deny the motion in light of the interest of the state in the finality of adoptive placements; intervenors' fundamental liberty interest in the care, custody, and control of their adopted children; and the children's fundamental right to preserve their relationship with intervenors.

¶ 7 While the legal proceedings continued, father began trying to arrange a meeting with the children. Eventually, he and intervenors agreed on a three-step process: first, he and intervenors would exchange letters of introduction; second, he and intervenors would meet; and finally, he would meet the children. The letters were exchanged in late April. In his letter, father thanked the intervenors for the care they had given the children and expressed his sympathy for them and his hope that they would have the strength to get through "this difficult time." However, he made it clear that he wanted the opportunity to raise the children himself. On April 29, father's attorney was advised that "given the tenor of [father's] letter," intervenors did not believe that there was much value in meeting with him, nor were they interested in setting up a meeting for him with the children.

¶ 8 Further efforts to resolve the question of visitation failed. In early May, father's attorney suggested raising the issue of parenting time at an upcoming status conference. In response, intervenors' attorney questioned father's legal right to parenting time and stated that intervenors did not believe that contact with father would be in the children's best interests. He indicated that intervenors would not agree to the court taking any action on visitation without a formal motion and response.

¶ 9 On May 31, the court conducted a hearing on the question of mother's alleged fraud. The court found that there was "overwhelming evidence" that mother had failed to disclose father's full identity and contact information to Adoption Choices, and that the termination of father's parental rights had been procured by fraud. Citing *In re C.L.S.*, 252 P.3d 556 (Colo.App.2011), the court determined that, as a matter of law, the prior termination of father's parental rights was void.

¶ 10 On June 1, 2013, father was allowed to meet the children for the first time. Intervenors were present during the entire visit, which lasted about one hour. No further visitation was offered to him.

¶ 11 A two-day hearing had been scheduled for June 25 and 26 to resolve the remaining issues in the case. After determining that the termination of father's parental rights was void, the court sua sponte continued that hearing to October 2 and 3, 2013, citing the parties' ongoing disputes over discovery and the need to ensure that all parties had the time needed to fully prepare and present their cases to the court. Father immediately asked the court to amend its order to permit the hearing to go forward on June 25 and 26 as planned. He argued that as a result of mother's fraud, he had been denied the opportunity to parent his children since their birth; he had done nothing to prolong the litigation because he knew that the longer it went on, "the louder would be the cries of both [Adoption Choices] and Intervenors that to remove the children from their adoptive home would [be] irreversibly or at least severely damaging to the children"; he was prepared to proceed; and there was no good cause for a continuance.

¶ 12 The court declined to change the hearing schedule, but agreed that father would be prejudiced unless he was able to exercise parenting time. Accordingly, in an order dated June 21, 2013, the court ordered the parties to "confer and arrange visitation for [father] with the children not less than two eight hour periods per week." Visitation was to take place at a location close to intervenors' home, and the first visit was to take place within seven days of the date of the order.

¶ 13 After parenting time was ordered, intervenors communicated directly with father to suggest that "it would be best for the boys to ease into [visitation] and go a bit more slowly." They suggested starting out with "a few shorter visits" with one of them present, and then working up to longer visits. Father responded, through his attorney, with a proposed parenting time plan that would have begun with four-hour visits, during which intervenors could be present for the first hour, and quickly ramped up to eight-hour visits, during which father would have sole parenting time. Intervenors rejected that plan and proposed two-hour visits, supervised by them, to begin the process.

¶ 14 When it became clear that the parties could not agree, father requested that the court schedule a status conference on the matter. Intervenors agreed that a status conference was needed, and asked the court to reduce the amount of visitation in light of the "negative impact" that they believed full and immediate implementation of the existing visitation order was likely to have on the children.

¶ 15 On June 27, after hearing from both father and intervenors, the court modified its order regarding visitation. The new order provided that father would have (1) two two-hour visits that would begin with one and one-half hours with the children and the intervenors, then one-half hour with the children alone; (2) then two three-hour visits that would begin and end with one-half hour with the children and the intervenors, separated by two hours that father could spend with the children alone; (3) then two three-hour visits that would begin with two and one-half hours with the children alone and end with one-half hour with the children and the intervenors; and (4) then four four-hour visits—or as many as the parties might agree to—that would begin and end with one-half hour with the children and the intervenors, separated by three hours with the children alone.

¶ 16 Father's first visit under the June 21 order, as modified by the June 27 order, took place on June 29, 2013. Over the following

three months, he missed parenting time on two weekends because he was "on call" for his employer, and on one weekend because intervenors were traveling out of state. On each of the remaining weekends, he traveled to Colorado for visits with the children. The length of his visits never increased beyond four hours, part of which was shared with intervenors.

¶ 17 After visitation was ordered, intervenors asked the court to appoint a guardian ad litem (GAL) "to investigate any and all matters pertaining to the best interests of the children and the possible termination of father's parental rights pursuant to [section] 19–5–105(3), (3.1), and (3.2), C.R.S.2014." In August, the court appointed a GAL to complete an investigation along the lines suggested by intervenors and prepare a written report to the court.

¶ 18 On September 23, ten days before the hearing on the termination of father's parental rights, the GAL submitted her report. Among other things, the GAL found that

- Intervenors were "extraordinary" as parents, even to the point of making all of the children's baby food at home from organic ingredients.
- The children were "active, happy, curious, and developmentally on track," and "clearly securely attached to [intervenors]."
- The children were also attached to their nanny, G.C., who cared for them approximately four days a week in their own home.
- There was nothing about [father] that was "in any way objectionable," but he was "naïve about the needs of his children," failing to understand that the children were attached to intervenors and viewed intervenors as their parents.
- Father had done his best to maintain regular and meaningful contact with the children, and he had established "familiarity" with them. However, he did not have a substantial, positive relationship with them.
- The issue of the children's attachment was of "utmost importance" in assessing their best interests.

The GAL concluded that although there was "no indication that [father] is or would be an unfit parent," it was in the best interests of the children to maintain their secure attachment with intervenors. Accordingly, she recommended termination of father's parental rights.

¶ 19 On October 2 and 3, 2013, the court heard the testimony of the parties and other witnesses, including experts retained by the parties to evaluate the children's relationships with father and with intervenors, and to offer opinions on the likely consequences of removing the children from intervenors' care or, alternatively, terminating father's parental rights. Based on the evidence presented, the trial court concluded that, although father had "the strong desire and apparent ability to assume legal and physical custody" of the children, he had not established a substantial, positive relationship with them and had not taken substantial parental responsibility for them. The court also found that removal of the children from intervenors' care would likely cause "significant psychological harm" to them. The court concluded that it was in the best interests of the children to terminate father's parental rights and place the children in the permanent legal custody of intervenors.

## II. Standard of Review

¶ 20 Because the parties do not agree on the correct standard of review to be applied by this court in considering the issues presented in this appeal, we will begin our analysis by addressing the standard of review.

¶ 21 A court's findings typically include two types of facts. Evidentiary facts are "the raw, historical data underlying the controversy." *Blaine v. Moffat Cnty. Sch. Dist. Re No. 1,* 748 P.2d 1280, 1287 (Colo. 1988). An ultimate fact "involves a conclusion of law or at least a determination of a mixed question of law and fact [that] settles the rights and liabilities of the parties." *Id.*

¶ 22 Generally, findings of fact are reviewed under a clear error or abuse of discretion standard, while conclusions of law are reviewed under a de novo standard. *E–*

*470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo.2000). When the issue before an appellate court is a mixed question of law and fact, such as may arise when the issue is whether statutory requirements were met, the court may take one of several possible approaches. First, the court may treat the ultimate conclusion as one of fact and apply the clear error standard. Second, the court may decide that de novo review is required. Third, the court may apply the clear error standard to the lower court's findings of fact and de novo review to the legal conclusions that the lower court drew from its findings of fact. *Id.*

¶ 23 We will review the trial court's findings of historical fact under the clear error standard, and we will review its legal conclusions and findings of ultimate fact under the de novo standard.

### III. The Parties' Rights and the State's Interests

¶ 24 Throughout the case, father has asserted a right to due process in matters relating to the termination of his parental relationship with the children. Among other things, he has contested intervenors' argument that the trial court should consider not just his fundamental liberty interest in the care, custody, and control of his children, but also the state's interest in preserving the finality of adoptive placements; intervenors' fundamental liberty interest in the care, custody, and control of their adopted children; and the children's fundamental liberty interest in continuing their relationship with their adoptive parents. Father has raised this issue again on appeal, albeit not in a separate argument.

¶ 25 The trial court concluded that in determining whether to terminate father's parental rights, it could take into account the fundamental rights of intervenors and the children as well as the state's interest in preserving the finality of adoptions. The court found that in this case, intervenors' fundamental interest in having the children remain with them and the children's fundamental interest in remaining with the only parents they had ever known outweighed father's fundamental liberty interest in having the children with him.

¶ 26 Although the court stated that its balancing of the fundamental liberty interests of the parties was not a "governing factor" in its final decision—the court stated that it had "principally rel[ied]" on its findings and conclusions under section 19–5–105—we conclude that to the extent that the court's analysis of the rights of the parties colored its interpretation of section 19–5105 and influenced its final decision, that analysis is relevant to the issues raised in this appeal, and we believe that a discussion of the parties' rights and the state's interests will be helpful in understanding our analysis of the issues presented on appeal. Accordingly, we will begin with that discussion.

#### A. Father's Rights

¶ 27 The parties do not dispute (and we agree) that father has a fundamental liberty interest in the care, custody, and control of his children. As the possessor of such an interest, father was entitled to the presumption that he was acting in the best interests of the children in seeking custody of them.

¶ 28 In *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the United States Supreme Court noted that this is "perhaps the oldest of the fundamental liberty interests recognized by this Court." Citing case after case in which the "fundamental right of parents to make decisions concerning the care, custody, and control of their children" had been recognized by the Court, the Court concluded that in light of such extensive precedent, it could not be doubted that the right of parents to make such decisions is protected by the Due Process Clause of the Fourteenth Amendment. *Id.* at 65–66, 120 S.Ct. 2054.

¶ 29 To give effect to a parent's right to due process in matters involving the care, custody, and control of his child, the Supreme Court held that "[i]f a fit parent's decision of the kind at issue here [in *Troxel*, grandparent visitation] becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70, 120 S.Ct. 2054. A

parent's fitness is important, because "there is a presumption that fit parents act in the best interests of their children." *Id.* at 68, 120 S.Ct. 2054. In *Troxel,* no court had found that the parent was unfit. Nevertheless, the lower court had given no special weight to the parent's determination of the children's best interests, and the lower court's order was not founded on any "special factors" that might have justified the state's interference with the parent's fundamental right to make decisions concerning the rearing of her children. *Id.* at 68–69, 120 S.Ct. 2054. Stating that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made," the Court found that the Washington grandparent visitation statute was unconstitutional as applied. *Id.* at 71, 120 S.Ct. 2054.

¶ 30 In Colorado, a parent's fundamental right to the care, custody, and control of his child has long been recognized. More than one hundred years ago, in a case involving a contest for custody between a mother and her child's grandparents, the Colorado Supreme Court stated that

> We are firmly of the opinion that in all cases of this character the presumption is that the parents are fit and suitable persons to be intrusted with the care of their minor children, and that the interests and welfare of such children are best subserved when under such care and control; that such presumption is like unto the presumption of innocence in a criminal case, ever present, throughout the controversy, until overcome by the most solid and substantial reasons established by plain and certain proofs.

*Wilson v. Mitchell,* 48 Colo. 454, 467–68, 111 P. 21, 26 (1910).

¶ 31 More recently, our supreme court has addressed the procedure to be used to give effect to a parent's fundamental right to make decisions for his child. In a case concerning grandparent visitation, the court held that in order to accommodate the "special weight" and "special factors" requirements of *Troxel,* (1) the court must first apply a presumption in favor of the parental visitation determination; (2) to rebut the presumption, the grandparents must show by clear and convincing evidence that the parental visitation determination is not in the child's best interests; and (3) the grandparents bear the ultimate burden of establishing by clear and convincing evidence that the visitation schedule they seek is in the best interests of the child. If the court orders grandparent visitation, it must then make findings of fact and conclusions of law identifying the special factors on which it relies. *In re Adoption of C.A.,* 137 P.3d 318, 322 (Colo.2006).

¶ 32 We conclude that where, as here, a court finds that a parent is "not unfit," the court must begin with the presumption that the parent is acting in his child's best interests in seeking custody of the child, and that it is not in the child's best interests to terminate the parent-child legal relationship or to award custody to another party. To rebut that presumption, a party seeking to terminate the parent's rights and obtain or retain custody of the child must prove by clear and convincing evidence not only that the statutory criteria for termination of the parent's rights set forth in section 19–5–105(3.1) and the criteria for an award of custody set forth in section 19–5–105(3.4) have been met, but also that it is not in the children's best interests to allow the parent-child legal relationship to remain intact nor to award custody of the child to the parent. If the court chooses to terminate the parent-child legal relationship and award custody to another party, as it did here, then, in addition to making findings regarding satisfaction of the statutory criteria for termination and custody, the court must make findings as to the "special factors" that justify rejecting the parent's determination of the child's best interests.

## B. Intervenors' Rights

¶ 33 Intervenors have asserted throughout the proceeding that the entry of final adoption decrees for the two children conferred on them a fundamental liberty interest in the care, custody, and control of the children that was equal to father's. We disagree.

### 1. Rights as Adoptive Parents

■ ¶ 34 Under section 19–5–211(1), C.R.S.2014, after the entry of a final decree of adoption, the person adopted is "to all intents and purposes, the child of the petitioner." And, after the entry of a final decree of adoption, adoptive parents have the same right as natural parents to control the upbringing of an adopted child. *In re C.A.*, 137 P.3d at 326. Accordingly, adoptive parents may properly assert that they, like natural parents, have a constitutionally protected liberty interest in the care, custody, and control of their children.

¶ 35 In the proceedings before the trial court, intervenors argued that although the order terminating father's parental rights had been declared void, the adoption decrees remained valid. They contended that under section 19–5–214(2), C.R.S.2014, the adoptions could be set aside only upon a showing by clear and convincing evidence that the decrees were not in the best interests of the children.

¶ 36 Section 19–5–214(2) provides:

When a final decree of adoption is attacked on any basis at any time, the court shall consider the best interests of the child, taking into account the factors set forth in section 14–10–124, C.R.S. The court shall sustain the decree unless there is clear and convincing evidence that the decree is not in the best interests of the child.

■ ¶ 37 However, "[i]t is elementary that the requirements of due process of law under both the United States and Colorado Constitutions take precedence over statutory enactments of our legislature." *White v. Davis*, 163 Colo. 122, 125, 428 P.2d 909, 910 (1967). In *White*, a biological father asserted that he had been denied due process when his children's mother and her husband, the children's stepfather, falsely denied knowledge of his whereabouts and caused notice of proceedings for the children's adoption to be made by publication. Several years later, after the mother's death, the father discovered that the children had been adopted. He moved to vacate the adoption decrees, alleging that the order authorizing service by publication had been wrongfully procured, and he had not had notice of the adoption

proceedings. The Colorado Supreme Court concluded that when an absence of due process is alleged, thus implicating the basic rights of the parties, it is "elementary" that the requirements of due process take precedence over any statutory enactment. *Id.* at 125, 428 P.2d at 910. The court concluded that if the biological father proved that the mother and stepfather had deprived him of notice of the adoption proceedings by falsely stating that service by publication was necessary because his address was unknown to them, the lower court "would have no alternative but to declare the adoption decrees void." *Id.* at 127, 428 P.2d at 911.

■ ¶ 38 Here, the court found that the order terminating father's parental rights was void because mother's fraudulent failure to disclose his full identity and contact information denied him due process. The same false statements by mother deprived father of notice of the adoption proceedings, thus denying him due process. A judgment entered in violation of due process is void. *C.L.S.*, 252 P.3d at 559.

■ ¶ 39 Moreover, under section 19–5–203(1), C.R.S.2014, a child is available for adoption only if its parents are unwilling or unable to assume its care, as evidenced by proof that they are deceased; they have abandoned the child; they have relinquished their parental rights; or their parental rights have been terminated in a proceeding brought under article 3 or 5 of Title 19. If the statutory requirements for adoption are not met, a decree of adoption is "absolutely void on its face" and subject to collateral attack at any stage of the proceedings or after entry of judgment. *See Fackerell v. Dist. Court*, 133 Colo. 370, 373–75, 295 P.2d 682, 684–85 (1956) (adoption decree void where natural mother had no notice of the adoption proceedings and had not relinquished the child); *see also In re Adoption of T.K.J.*, 931 P.2d 488, 491 (Colo.App.1996) (adoption is a creature of statute; thus, if a proposed adoption fails to conform to statutory requirements, the effort to adopt must fail and the trial court has no power to enter a decree of adoption).

¶ 40 Here; father was living; he had not abandoned the children; and he was unwilling to relinquish his parental rights. Thus, termination of his parental rights was necessary to make the children available for adoption. His parental rights were terminated shortly after the children's birth; and final adoption decrees were entered in December 2012. But, seven months later, citing "overwhelming evidence" that mother had failed to disclose father's full identity and contact information to Adoption Choices, the court determined that the termination order was void because it had been procured by fraud.

¶ 41 Because the order terminating father's parental rights was void, and because the statutory requirements for adoption could not be met without terminating father's parental rights, the adoption decrees were also void. *Fackerell,* 133 Colo. at 373–75, 295 P.2d at 684–85; *T.K.J.,* 931 P.2d at 491. Accordingly, we conclude that intervenors do not have a liberty interest in their relationship with the children as adoptive parents.

2. Rights as Prospective Adoptive Parents

¶ 42 In *M.S. v. People,* 2013 CO 35, 303 P.3d 102, the Colorado Supreme Court considered whether prospective adoptive parents have a protected liberty interest in their relationship with the child they hope to adopt. The court noted that courts in other jurisdictions have held in some cases that the initiation of the adoption process in accordance with the laws of the prospective adoptive parents' state, together with the particular facts and circumstances of the case, could give rise to a reasonable expectation that the relationship with the child would become permanent, and that, in turn, could give rise to a liberty interest. *Id.* at ¶¶ 16–19, 303 P.3d at 106–07. In *M.S.,* the child's legal relationship with his biological parents had been terminated, so he was available for adoption. *Id.* at ¶ 3, 303 P.3d at 103. However, the foster parents had not initiated the adoption process or taken any necessary procedural steps toward adopting the child. The court concluded that they did not have a reasonable expectation that their relationship with the child would become permanent, and therefore did not have a liberty interest

grounded in the United States constitution. *Id.* at ¶¶ 20–21, 303 P.3d at 107.

¶ 43 Here, intervenors not only initiated the adoption process, they saw it through to the finalization of the adoptions of the children. However, for the reasons discussed above, the adoption decrees are void. Accordingly, any claim that intervenors have to a liberty interest in their relationship with the children must be based upon a reasonable expectation that their relationship with the children will become permanent.

¶ 44 We conclude that intervenors cannot have a reasonable expectation of developing a permanent relationship with the children in the circumstances present here.

¶ 45 First, on the day of the children's birth, intervenors entered into a placement agreement with Adoption Choices. Among other things, the agreement provided that

Adoptive Parents acknowledge that Adoption Choices is relying on information from the birth mother as to the father's identity. If this information is incorrect, the legal father may have a claim to the child in the future. If the parent-child legal relationship of the child's legal father is not properly terminated, he may be entitled to custody of the child. The adoptive parents agree to assume the risk that a termination of the legal father's parent-child legal relationship will not occur and that their placement will be terminated.

¶ 46 Thus, from the first, intervenors were aware that father had an already-existing legal relationship with the children; that their plan to adopt the children could proceed *only* if father's legal relationship with the children was terminated; and that if father's legal relationship with the children was not terminated, father would be entitled to seek custody of the children. By signing the placement agreement, intervenors agreed to assume that risk.

¶ 47 Second, the existence of father's parental rights is a legal barrier to any attempt by intervenors (or anyone else) to adopt the children, and that barrier will remain in place at least until this litigation is at an end (and will become permanent if father's parental rights ultimately are not terminated). We

are persuaded that as long as the children are not legally free for adoption, thus preventing intervenors from pursuing legal action to adopt them, intervenors' position is similar to that of prospective adoptive parents who wish to adopt a child in their care but have not initiated the adoption process. In *M.S.*, the Colorado Supreme Court concluded that prospective adoptive parents who *had not* taken legal steps toward adoption did not have a reasonable expectation that their relationship with the child in their care would become permanent and thus, did not possess a liberty interest in that relationship. *Id.* at ¶ 20, 303 P.3d at 107. We conclude that, at least in the circumstances present here, prospective adoptive parents who *cannot* take legal steps toward adoption also lack a reasonable expectation that the relationship with the child in their care will become permanent, and therefore lack a liberty interest in the relationship.

¶ 48 In the absence of a reasonable expectation that their relationship with the children will become permanent, we conclude that intervenors do not have a liberty interest in their relationship with the children as prospective adoptive parents.

### C. The Children's Rights

¶ 49 Intervenors have asserted throughout the proceeding that the children have a fundamental right to continue their relationship with intervenors and to have a stable and permanent home. In support of this claim, they cite *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), for the proposition that "[c]hildren generally are protected by the same constitutional guarantees against governmental deprivations as are adults ...."; *Troxel*, 530 U.S. at 88, 120 S.Ct. 2054, for the proposition that it is "extremely likely that, to the extent parents and families have fundamental liberty interests in preserving [familial] relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation"; and *In re Jasmon O.*, 8 Cal.4th 398, 33 Cal.Rptr.2d 85, 878 P.2d 1297, 1307 (1994), for the proposition that "[c]hildren, too, have fundamental rights—including the fundamental right to be pro-

tected from neglect and to 'have a placement that is stable [and] permanent.'" (Quoting *In re Marilyn H.*, 5 Cal.4th 295, 19 Cal. Rptr.2d 544, 851 P.2d 826, 833 (1993).)

¶ 50 Although it may be generally true that children are protected by the same constitutional guarantees against governmental deprivations as adults, *Bellotti* is not a case that involves the deprivation of parental rights or the right to maintain "familial relationships." Thus, it does not support the proposition that children have a liberty interest in maintaining their existing placement.

¶ 51 The *Troxel* quote is taken from Justice Stevens' dissent, in which he remarked that although the Supreme Court "has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds," it seemed to him "extremely likely" that children have such interests, just as parents and families do. 530 U.S. at 88, 120 S.Ct. 2054 (Stevens, J., dissenting). This was dictum, not the holding of the case. Thus, it does not establish the existence of such a liberty interest.

¶ 52 *Jasmon O.* is not a Colorado case and therefore not binding on a Colorado court.

¶ 53 We are unaware of any authority that *is* binding on Colorado courts that stands for the proposition that a child has a constitutional liberty interest that is reciprocal to the liberty interest that a parent has in his relationship with his child. Moreover, we note that the only liberty interest that we have found in this case is the liberty interest that father has in the care, custody, and control of the children. Intervenors have no such interest. Thus, any "reciprocal" liberty interest that the children might have would, presumably, include an interest in maintaining a relationship with father, not intervenors.

¶ 54 We do not disagree that children have "an interest" in stability and permanency. However, in the absence of any legal authority for the proposition that they have a fundamental right to maintain their relationship with intervenors, we decline to recognize such a right.

### D. The Interest of the State

¶ 55 Intervenors have contended throughout the proceeding that the interest of the state, as reflected in the legislative declaration set forth in section 19–5–100.2(2), C.R.S.2014, is "to promote the integrity and finality of adoptions to ensure that children placed in adoptive placements will be raised in stable, loving, and permanent families." The trial court agreed, noting that section 19–5–100.2(2) further states that "[t]he general assembly intends that by enacting this legislation, it will be protecting children from being uprooted from adoptive placements and from the life-long emotional and psychological trauma that often accompanies being indiscriminately moved."

¶ 56 When interpreting a statute, a court's task is to give effect to the intent of the General Assembly. *See, e.g., Colo. Office of Consumer Counsel v. Pub. Utils. Comm'n,* 42 P.3d 23, 27 (Colo.2002). We avoid interpreting a statute in a way that would defeat the obvious intent of the legislature. *Id.*

¶ 57 The language at issue must be read in the context of the statute as a whole and the context of the entire statutory scheme. *Bynum v. Kautzky,* 784 P.2d 735, 736 (Colo. 1989). Thus, our interpretation should give consistent, harmonious, and sensible effect to all parts of a statute. *People v. Dist. Ct.,* 713 P.2d 918, 921 (Colo.1986).

¶ 58 Here, section 19–5–100.2(2) clearly states that it is the intent of the General Assembly to promote the integrity of adoptions and protect children from the trauma of being uprooted from an adoptive placement. However, the purposes of the Colorado Children's Code as a whole are more broadly focused on preserving and strengthening family ties generally:

(a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;

(b) To preserve and strengthen family ties whenever possible, including improvement of home environment; [and]

(c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered and, in either instance, for the courts to proceed with all possible speed to a legal determination that will serve the best interests of the child.

§ 19–1–102(1), C.R.S.2014.

¶ 59 If we were to construe section 19–5–100.2(2) to state that it is the intent of the General Assembly to promote the integrity of an adoptive placement even when doing so would require the court to acquiesce in the destruction of a viable biological family by fraud, such a construction would not allow us to give sensible effect to the purposes of the Children's Code as a whole. Thus, we reject that construction.

¶ 60 A solution to our dilemma can be found in section 19–5–100.2(1), in which the General Assembly "finds that parental relinquishment and adoption of children are important and necessary options to facilitate the permanent placement of minor children *if the birth parents are unable or unwilling to provide proper parental care.*" (Emphasis added.) We construe section 19–5–100.2(1) to mean that adoption is intended to be an option only for those children whose parents are unable or unwilling to care for them. This construction is consistent with section 19–5–203(1), which provides that a child is available for adoption only if its parents are unwilling or unable to assume its care, and section 19–5–105(3.1), which sets forth factors to be considered in determining whether a nonrelinquishing parent has demonstrated his willingness and ability to care for the child.

¶ 61 Reading the language of section 19–5–100.2(2) in the context of the statute as a whole and in the context of the entire statutory scheme persuades us that the General Assembly intended to protect and promote the integrity of both adoptive families and biological families, and did not intend to promote the integrity of one at the expense of the integrity of the other.

¶ 62 We conclude that the trial court misconstrued section 19–5100.2(2) to the extent that it failed to recognize that it is also the intent of the General Assembly to protect,

preserve, and strengthen biological families, and thus failed to recognize that the integrity of an adoption is not to be preserved at the cost of denying the rights of a fit biological parent.

## IV. Section 19–5–105 and the Termination of Father's Parental Rights

¶ 63 Father contends that the trial court erred in finding that the termination of his parental rights was in the children's best interests; in applying an inappropriate standard in concluding that he had not established a substantial positive relationship with the children; in applying an inappropriate standard in finding that he had not promptly taken parental responsibility for the children; and in permitting intervenors to present evidence other than that regarding his contact, communication, and relationship with the children. We agree generally with his contentions and will address each in turn below.

### A. Section 19–5–105, the *Troxel* Presumption, and the Children's Best Interests

¶ 64 Father contends that the evidence does not support the court's conclusion that the children likely would suffer "significant psychological harm" if removed from the home of the intervenors and the court inappropriately considered the issue of custody during the termination proceeding. We agree.

#### 1. Termination Proceedings under Section 19–5–105

¶ 65 As an initial matter, we note that after a petition to terminate the parental rights of a nonrelinquishing parent has been filed, the case proceeds in three stages.

¶ 66 In the first stage, if a nonrelinquishing parent or possible parent fails to appear, waives his or her right to appear and contest, or appears and cannot personally assume legal and physical custody of the child, taking into account the child's age, needs, and individual circumstances, such person's parental rights are terminated. § 19–5–105(3).

¶ 67 In the second stage, if a nonrelinquishing parent or possible parent appears and demonstrates the desire and ability to personally assume legal and physical custody of the child, taking into account the child's age, needs, and individual circumstances, and if such person's parentage is confirmed, a hearing is scheduled to determine whether the interests of the child or of the community require that the nonrelinquishing parent's rights be terminated, or, if not terminated, whether to award custody to the nonrelinquishing parent or to the physical custodian of the child, or whether to direct that a dependency and neglect action be filed. *Id.*

¶ 68 Termination of the nonrelinquishing parent's rights may be ordered if the court finds that termination is in the child's best interests and that there is clear and convincing evidence of one or more of the following: (1) that the parent is unfit; (2) that the parent has not established a substantial, positive relationship with the child; and (3) that the parent has not promptly taken substantial parental responsibility for the child. § 19–5–105(3.1). In considering the termination of parental rights, the court must give paramount consideration to the physical, mental, and emotional conditions and needs of the child, and shall specifically consider whether the child has formed a strong, positive bond with the child's custodian, the time period that the bond has existed, and whether removal of the child from the physical custodian would likely cause significant psychological harm to the child. § 19–5105(3.2).

¶ 69 In the third stage, if the court determines not to terminate the nonrelinquishing parent's rights, nor to direct that a dependency and neglect action be filed, the court will proceed to determine custody of the child, parenting time, duty of support, and recovery of child support debt. § 19–5–105(3.4).

¶ 70 Here, the proceedings had reached the second stage, and the hearings held in October 2013 were intended to consider whether father's parental rights should be terminated.

#### 2. The Children's Best Interests and Father's Parental Rights

¶ 71 Under section 19–5–105(3.1), the court may order the termination of the nonrelin-

quishing parent's parental rights upon a finding that termination is in the child's best interests and that there is clear and convincing evidence of one or more of the additional factors set forth in section 19–5–105(3.1)(a)–(c).

¶ 72 In construing a statute involving the best interests of the child, the court's objective is to interpret the statute in a manner consistent with its plain language while avoiding constitutional infirmity. *In re D.I.S.*, 249 P.3d 775, 782 (Colo.2011). "[W]hile what is in the best interests of the child is the primary inquiry, this does not 'automatically overcome the constitutional interest of the parents.'" *Id.* (quoting *In re Marriage of Ciesluk*, 113 P.3d 135, 147 (Colo. 2005)).

¶ 73 The constitutional presumption that a fit parent acts in the child's best interests applies to all stages of a custody proceeding. *In re B.J.*, 242 P.3d 1128, 1132 (Colo.2010). It may be rebutted by clear and convincing evidence that the parent's decision is not in the child's best interests. *Id.* The trial court must give "special weight" to the parent's determination of the child's best interests. *D.I.S.*, 249 P.3d at 781. If the court rules against the parent's determination of the child's best interests, it must make findings of fact identifying the "special factors" on which it relies. *B.J.*, 242 P.3d at 1132.

¶ 74 Judges "must avoid the temptation to substitute the court's judgment for the parent's judgment" because " '[t]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a "better" decision could be made.'" *In re C.A.*, 137 P.3d at 327 (quoting *Troxel*, 530 U.S. at 72–73, 120 S.Ct. 2054).

¶ 75 Here, father determined that the children should be in his custody. He testified that he believed that it would be in their best interests to be with him for "multiple reasons," including the fact that he was their biological father and the fact that, as a black man, he could help them face the problems that they would have to face as mixed-race children. He expressed doubt that intervenors, who are white, would be able to help the children deal with the issues that they would face as well as he could.

¶ 76 He acknowledged that he had heard "different opinions" regarding the possibility that the children would suffer psychological harm if removed from intervenors' home, but stated that he believed that they would have a better chance of overcoming that than overcoming the experience of finding out, at a later age, that they had been taken from their father through the fraud of their mother. He testified that he had already begun to learn how to help the children with their feelings because he did it during his visits with them. He stated that he had been saving vacation days so that he could take time off to spend with the children after he got custody, and he had taken a parenting class and learned of resources he could call upon if he needed help.

¶ 77 Citing *In re Custody of C.C.R.S.*, 872 P.2d 1337 (Colo.App.1993), and other custody cases, the court determined that it was in the children's best interests to remain in the custody of intervenors. The court acknowledged that father was not unfit, and, as the children's biological parent, he had a prior right to custody. Nevertheless, the court concluded that intervenors were "for all practical purposes both their psychological and actual parents" and if they were removed from intervenors' custody, "there will be significant psychological harm." The court did not cite the evidence that it relied on to support this conclusion.

¶ 78 The court also found that

While there has been a suggestion for a "transition period" if custody were transferred to [father] ... such a proposal is unrealistic, impractical and unachievable. No one, including the experts or this court, can predict how the children might, or might not, adjust to a transfer to [father]. The court cannot afford to speculate about the future under different circumstances. That is unknowable at this time. What is known is that the children are thriving in their present environment with [intervenors] and that a change will cause them

significant psychological harm. Under all of these circumstances, the court finds and concludes that, in addition to the statutory reasons for termination [set forth elsewhere in the opinion], the best interests of these children would be served by their remaining in the custody of [intervenors].

¶ 79 We conclude that the trial court erred in concluding that if the best interests of the children would be served by granting custody of the children to intervenors, then the best interests of the children would also be served by termination of father's parental rights.

¶ 80 As shown in the trial court's extensive discussion of Colorado cases concerning custody, in some circumstances Colorado law grants a nonparent standing to seek custody of a child, and permits the nonparent to obtain custody of the child if it is in the child's best interests. However, as the supreme court was careful to point out in *C.C.R.S.*, denying a parent custody of his child is quite a different matter than terminating his parental rights, thus depriving him not only of physical custody of the child, but also of all rights to visit, communicate with, or ever regain custody of the child. *In re Custody of C.C.R.S.*, 892 P.2d 246, 254–55 (Colo.1995). We are aware of no Colorado authority for the proposition that parental rights may be terminated simply because the child might be better off in a different home. Indeed, in *People in Interest of E.A.*, 638 P.2d 278, 285 (Colo.1981), the supreme court expressly stated that because termination divests both parent and child of all legal rights and obligations with respect to one another, "the power of the state to sever parental ties should be exercised with extreme caution," and "[t]he parental relationship should not be terminated simply because the child's condition thereby might be improved."

### 3. The *Troxel* Presumption

¶ 81 We conclude that the trial court's best interests finding is also flawed because the court erred in failing to give father the benefit of the *Troxel* presumption. Having found that father was "not unfit," the trial court was required to presume that his decisions were in the best interests of the children. *In re Parental Responsibilities of Reese*, 227 P.3d 900, 901–04 (Colo.App.2010).

¶ 82 In *Reese*, an allocation of parental responsibilities was sought by a couple who had been caring for a child, with the adoptive mother's approval, since shortly after the child's birth. Gradually the amount of time that they had the child increased until the child was living with them and having only minimal contact with the mother. A division of this court concluded that a court cannot allocate parental responsibilities to nonparents, contrary to the wishes of a parent, unless it complies with the *Troxel* requirement to accord "special weight" to the parent's determination of the child's best interests and, after considering "all relevant factors," concludes that the child's best interests justify such an allocation. *Id.* at 903. The division then rejected the nonparents' argument that the lower court's finding that they were the psychological parents of the child not only established that they had standing to seek an allocation of parental rights, but was sufficient to show that special weight had been given to the mother's determination of the child's best interests.

¶ 83 Here, in a case involving not just a question of custody but the more serious question of termination of parental rights, the trial court appears to have erred in the same manner as the court in *Reese*. The court assigned great importance to the children's attachment to intervenors, finding that the children had a "strong positive bond" with intervenors and that their removal from intervenors' home would "likely result in significant psychological harm." Father's plans for transitioning the children into his care were rejected because, in the view of the court, father had "not fully appreciated" the children's strong attachment to intervenors and the psychological trauma they would experience by removal, and, although he testified that he had begun to learn about attachment issues and that he would seek help as necessary to deal with them, he "had not yet consulted with any professionals other than brief discussions in his parenting class and with Dr. Spiegle," and he had "no specific plan to deal with the trauma the children will

experience except perhaps to give them more love and attention."

¶ 84 There is nothing in the court's analysis that suggests that the court accorded any "special weight" to father's liberty interest in the care, custody, and control of his children. There is no indication that the court began with a presumption that father's decision to seek custody of the children was in the children's best interests, or with a presumption that his plans for the transition of the children from intervenors' home into his were made with their best interests in mind. The court did not require intervenors to prove by clear and convincing evidence that father's plan for the transition would not succeed or that it would be harmful to the children; rather, the court appears to have placed the burden on father to prove that his plan would succeed. The court did not identify any specific "special factors" that led to its decision to reject father's plans for the children.

¶ 85 We conclude that the trial court erred in failing to accord "special weight" to father's determination that the children's best interests would be served by placing them in his custody, as required under *Troxel*, and in failing to identify the "special factors" justifying rejection of his determination.

### 4. Balancing of Liberty Interests

¶ 86 Finally, because intervenors do not have a fundamental liberty interest in the care, custody, and control of the children, and the children's fundamental liberty interest in maintaining their relationship with intervenors is unclear, we conclude that the trial court erred in balancing their supposed liberty interests against father's liberty interest and in concluding that their interests outweighed his.

### B. Failure to Establish a Substantial, Positive Relationship with the Children

¶ 87 Under section 19–5–105(3.1)(b), clear and convincing evidence of a parent's failure to establish a substantial, positive relationship with his child is a proper ground for terminating his parental rights when combined with proof that termination is in the child's best interests. Father contends that

the court erred in applying a "child-centered" standard rather than the "parent-centered" standard required in determining whether a parent has established the required relationship; in failing to recognize or give adequate weight to his affirmative defense that impediments created by mother and the intervenors severely limited his contact with the children; and in failing to count his visits with the children as "regular and meaningful contact" with them. Because we agree that the court erred in recognizing the impediments but failing to credit father with an affirmative defense to the requirement that he establish a substantial, positive relationship with the children, we need not address his remaining contentions.

¶ 88 In determining whether a parent has established a substantial, positive relationship with a child, the court is required to consider (but is not limited to) the following factors:

(I) Whether the parent has maintained regular and meaningful contact with the child;

(II) Whether the parent has openly lived with the child for at least one hundred eighty days within the year preceding the filing of the relinquishment petition or, if the child is less than one year old at the time of the filing of the relinquishment petition, for at least one-half of the child's life; and

(III) Whether the parent has openly held out the child as his or her own child.

§ 19–5–105(3.1)(b).

¶ 89 The court found that father had openly held out the children as his own children, and that he had made a substantial effort to establish a substantial and positive relationship with them given the geographic distances involved and the time available to him. The court found, nevertheless, that father had not established a substantial, positive relationship with the children based on the absence of evidence of their attachment to him.

¶ 90 Section 19–5–105(3.3) provides:

If the child is under one year of age at the time that the relinquishment petition is

filed, there is an affirmative defense to any allegations under subparagraph (VI) of paragraph (a), paragraph (b), and paragraph (c) of subsection (3.1) of this section that the parent's neglect, failure to establish a substantial relationship, or failure to take substantial responsibility for the child was due to impediments created by the other parent or person having custody. A parent shall demonstrate such impediments created by the other parent or person having custody by a preponderance of the evidence.

¶ 91 Father contends that mother's fraud and the intervenors' "personal and legal resistance" to giving him significant parenting time with the children impeded his ability to establish a substantial and positive relationship with them. He argues that the court erred in giving no weight to the fact that mother's fraud created an impediment to his ability to establish a relationship with the children during their first nine months, and in recognizing an impediment created by intervenors' actions to restrict his parenting time, but then excusing the impediment because the court deemed it "entirely reasonable and in the best interests of the children."

¶ 92 We agree that the court misconstrued and misapplied section 19–5–105(3.3).

¶ 93 First, the court erred in disregarding the impediment created by mother's fraud, which denied father knowledge of the children's existence during their first three months, and delayed his access to the children for an additional six months while the parties litigated the question of mother's fraud.

¶ 94 Second, the court erred in excusing the impediment created by intervenors' resistance to his efforts to assert his parental rights, culminating in their successful efforts to limit the parenting time that had initially been ordered by the court. When construing a statute, our goal is to effectuate the intent of the General Assembly. To do so, we look to the plain meaning of the statutory language and consider it within the context of the statute as a whole. *S. Ute Indian Tribe v. King Consol. Ditch Co.*, 250 P.3d 1226, 1232–33 (Colo.2011). We do not add words

to the statute or subtract words from it. *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007).

¶ 95 Here, the plain language of the statute indicates that although a parent's failure to establish a substantial relationship with his child is generally a factor that the court may consider in deciding whether the parent's legal relationship with the child should be terminated, a parent's failure to establish a substantial relationship with a very young child may be excused if evidence shows that the parents' efforts to establish a substantial relationship with the child were thwarted by the other parent or by a person having custody of the child. Nothing in the language of section 19–5–105(3.3) suggests that the General Assembly intended that there should be an exception to the affirmative defense allowing the court to excuse an impediment to a parent's efforts so long as the impediment is alleged to be in the child's best interests. We will not read such a modification into the statute. To do so would allow a person having custody and control of a child too young to speak for himself or herself to prevent a parent from having access to the child by simply reporting that contact with the parent was distressing or harmful to the child and, thus, not in the child's best interests. Without access to the child, the parent would find it difficult or impossible to refute the custodian's claim, and the parent could be unreasonably deprived of a chance to develop a relationship with his child.

¶ 96 Because we are not persuaded that the General Assembly intended that there should be a "best interests" exception to the affirmative defense provided in section 19–5–105(3.3), and because, in any event, the trial court did not find that the impediment created by mother's concealment of the children from father was in their best interests, we conclude that the court erred in finding that father had failed to establish an affirmative defense to the allegation that he had not established a substantial relationship with the children.

### C. Failure to Promptly Take Substantial Responsibility for the Children

¶ 97 Under section 19–5–105(3.1)(c), clear and convincing evidence of a parent's failure

to promptly take substantial parental responsibility for his child is a proper ground for terminating his parental rights when combined with a finding that termination is in the child's best interests. Father contends that the court erred in considering only his payment of child support during a three-month period in determining whether he had taken "substantial responsibility" for the children. We conclude that the court abused its discretion in doing so.

¶ 98 In determining whether a parent has promptly taken substantial parental responsibility for his child, the court is required to consider (but is not limited to) the following factors:

(I) Whether the parent who is the subject of the petition is served with notice and fails to file an answer within thirty-five days after service of the notice and petition to terminate the parent-child legal relationship, or within twenty-one days if the petition for termination was filed pursuant to section 19–5–103.5, or fails to file a paternity action, pursuant to article 4 of [title 19], within thirty-five days after the birth of the child or within thirty-five days after receiving notice that he is the father or likely father of the child, or, for those petitions filed pursuant to section 19–5–103.5, within twenty-one days after the birth of the child or after receiving notice that he is the father or likely father of the child;

(II) Whether the parent has failed to pay regular and reasonable support for the care of the child, according to that parent's means; and

(III) Whether the birth father has failed to substantially assist the mother in the payment of the medical, hospital, and nursing expenses, according to that parent's means, incurred in connection with the pregnancy and birth of the child.

§ 19–5–105(3.1)(c).

¶ 99 The trial court found factors (I) and (III) inapplicable here, in light of mother's fraud and other circumstances, but found that father had failed to pay regular and reasonable support for the children because he had made only one child support payment, in the amount of $250, in the months after he

discovered that he was the father of the children. Father contends that this was an inadequate basis for finding that he had failed to provide regular and reasonable support for the children. He argues that the court erred in failing to consider the considerable expenses that he incurred in exercising his parenting time, the amounts that he spent on food, clothing, toys, etc. for the children, and his ability to pay. We agree that the court's analysis was too narrowly focused on a single factor and did not adequately consider father's expenditures, his ability to pay child support, and other evidence relating to his efforts to "take responsibility for" the children.

¶ 100 The record shows that child support was raised for the first time on June 27, 2013, when, during a hearing, the court told the parties that the issue was "out there" and should be addressed. The court did not enter an order regarding child support, but suggested that the parties should discuss it. Thereafter father requested financial information from intervenors on several occasions, stating that it was needed so that an appropriate child support payment could be determined. Intervenors declined to provide any additional financial information, and father eventually made a $250 payment to intervenors a few weeks before the termination hearing.

¶ 101 The trial court recognized that father had spent substantial sums on traveling to and from Colorado for visits with the children, and had purchased food, clothing, car seats, a stroller and other items to facilitate the visits. However, the court concluded that the evidence would not support a finding that father had provided either "regular" or "reasonable" support for the children, or that he had "promptly taken substantial responsibility" for them.

¶ 102 We conclude that, where the evidence showed that father had expended substantial sums on travel to visit the children, and, presumably, expended even larger sums on hard-fought litigation seeking to gain custody of them, and where the evidence further showed that father had attempted to work with intervenors to determine a reasonable

amount to pay for the support of the children and had been rebuffed, the court's decision to make a finding as to whether father had taken substantial responsibility *solely* on the amount and timing of a single child support payment was unreasonable and unfair, and thus, an abuse of the court's discretion. *See E–470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo.App.2006) (A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, and "[i]n assessing whether a trial court's decision is manifestly unreasonable, arbitrary, or unfair, we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options.").

## D. Intervenor's Participation

¶ 103 Section 19–5–105(3.6) provides:

Except for a parent whose parental rights have been relinquished pursuant to section 19–5104, a person who has or did have the child in his or her care has the right to intervene as an interested party and to present evidence to the court regarding the nonrelinquishing parent's contact, communication, and relationship with the child. If custody is at issue pursuant to subsection (3.4) of this section, such person also has the right to present evidence regarding the best interests of the child and his or her own suitability as a placement for the child.

¶ 104 Here, father requested that the court limit intervenors' participation in the termination hearing to presentation of evidence regarding his contact, communication, and relationship with the children, as provided in section 19–5–105(3.6). The court denied the motion and permitted intervenors to present evidence regarding the children's best interests and their own suitability as a continuing placement for the children before a decision had been made regarding the termination of father's parental rights.

¶ 105 Because section 19–5–105(3.4)(a) provides that the court "shall proceed to determine custody of the child" *if* the court "determines not to terminate the nonrelinquishing parent's parental rights," we have concluded that it is the intent of the General Assembly

that under section 19–5–105, the termination decision is to precede the custody decision. Because section 19–5–105(3.6) provides that a person permitted to intervene as an interested party has the right to present evidence regarding the nonrelinquishing parent's contact, communication, and relationship with the child, and then, *if* custody is at issue, such person *also* has the right to present evidence regarding the best interests of the child and his or her own suitability as a placement, we also conclude that it is the intent of the General Assembly that an intervenor's right to present evidence during the termination hearing is to be limited to evidence regarding the nonrelinquishing parent's contact, communication, and relationship with the child. Thus, the trial court erred in permitting intervenors to present evidence regarding the best interests of the children and their suitability as a placement for the children during the termination hearing.

## V. Custody

¶ 106 The trial court elected to address the issue of custody together with the issue of termination, notwithstanding the statutory requirement that termination be decided before custody and the parties' understanding that only the issue of termination would be addressed at the October hearings. Accordingly, we will address it.

¶ 107 Under section 19–5–105(3.4)(b), if the court determines not to terminate a nonrelinquishing parent's parental rights, the court "shall determine custody based upon the best interests of the child giving paramount consideration to the physical, mental, and emotional conditions and needs of the child."

¶ 108 As discussed above, we conclude that the court erred in failing to accord "special weight" to father's determination that the children's best interests would be served by placing them in his custody, as required under *Troxel*; in failing to identify any "special factors" justifying rejection of his determination; and in finding that father's fundamental liberty interest in the care, custody, and control of his children was outweighed by intervenors' alleged "fundamental interest in having the children remain with them" and by

the children's alleged "fundamental interest in remaining with the only parents they have ever known."

¶ 109 Accordingly, the court's custody determination cannot stand.

## VI. Conclusion

¶ 110 The judgment of termination is reversed and the matter is remanded. On remand, the trial court shall conduct a hearing on custody after affording father a full and fair opportunity to establish a meaningful relationship with his children. At such a hearing, father shall be afforded the presumption that he will act in the best interest of his children and appropriate weight shall be given to the father's liberty interest in the custody and care of his children.

BOORAS and MÁRQUEZ *, JJ., concur