2015 CO 72

**IN the INTEREST OF Minor Children: BABY A and Baby B**

**T.W. and A.W., Petitioners**

and

**Adoption Choices of Colorado, Inc., Petitioner**

v.

**M.C., Respondent**

**Supreme Court Case No. 14SC1045**

Supreme Court of Colorado.

December 21, 2015

Rehearing Denied January 11, 2016

Attorneys for Petitioners T.W. and A.W.: Sherman & Howard, L.L.C., Rajesh K. Kukreja, Denver, Colorado.

Attorneys for Petitioner Adoption Choices of Colorado, Inc.: Catherine A. Madsen, P.C., Catherine A. Madsen, Westminster, Colorado.

Attorneys for Respondent M.C.: Lasher Legal Resolution, P.C., S. Scott Lasher, Denver, Colorado, Snodgrass Law, LLC, Kelly L. Snodgrass, Denver, Colorado.

Attorneys for Amicus Curiae Rocky Mountain Children's Law Center: Rocky Mountain Children's Law Center, Jeffrey C. Koy, Elizabeth A. Fordyce, Denver, Colorado Morrison & Foerster LLP, Randall J. Fons, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Office of the Child's Representative: Colorado Office of the Child's Representative, Dorothy M. Macias, Amanda Donnelly, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Gay Lesbian Bisexual Transgender Bar Association: Johnson Márquez Legal Group, Rachel Catt, Denver, Colorado, Reilly Pozner LLP, John McHugh, Denver, Colorado.

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 This appeal is about two little boys and the question of who will be their parents. M.C. was unaware that he had become a father to twin boys because the children's biological mother, J.Z., had previously told him that she had suffered a miscarriage. Subsequently, J.Z. relinquished her parental rights and in doing so provided false information about the identity of the biological father. As a result, the trial court terminated M.C.'s parental rights and the children were placed for adoption. T.W. and A.W., who were unaware of J.Z.'s deception, then adopted the children. After M.C. learned that he was the children's father and that the children had been adopted, he petitioned the court to void the termination of his parental rights based on J.Z.'s fraudulent statements. The court reinstated M.C.'s parental rights, and he sought to gain custody of the children. Because the birth mother had relinquished her rights and consented to the twins' adoption, the case proceeded to trial to determine if termination of M.C.'s parental rights under section 19–5–105, C.R.S. (2015), was appropriate.

¶ 2 After a two-day bench trial, the trial court found, pursuant to section 19–5–105(3.1)(c), that M.C. had failed to promptly take substantial responsibility for the children and that termination was in the best interests of the children. Therefore, the trial court terminated M.C.'s parental rights and awarded custody of the children to the adoptive parents. The court of appeals reversed and remanded the case to the trial court to "conduct a hearing on custody after affording

[M.C.] a full and fair opportunity to establish a meaningful relationship with his children." *M.C. v. Adoption Choices of Colo., Inc.*, 2014 COA 161, ¶ 110, 2014 WL 6485660.

¶ 3 We granted certiorari to review whether the court of appeals erred in reversing the trial court's order terminating M.C.'s parental rights under section 19–5–105.[1] We reverse and hold that while M.C. has a liberty interest in the care, custody, and control of his children, the court of appeals erred when it found that the trial court violated M.C.'s due process rights by failing to apply the presumption articulated in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion).[2] Rather, we hold that the trial court in this case satisfied *Troxel's* heightened due process requirements when it terminated his parental rights. Furthermore, we hold that the trial court did not abuse its discretion in considering only M.C.'s single child support payment when it concluded that he did not take "substantial responsibility" for the children, and that the record supports the trial court's ultimate decision to terminate M.C.'s parental rights. Accordingly, we reverse and remand the case to the court of appeals with instructions to return the case to the trial court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶ 4 On September 13, 2012, J.Z. gave birth to twins, Baby A and Baby B, in Colorado. J.Z., who lived in Colorado at the time of the twins' birth, had previously been in a long-distance relationship with M.C., who lived in Iowa. She told him about the pregnancy in January of that year and moved to Iowa in March to live with him. At that time, J.Z. told M.C. that she suffered a miscarriage. A month later, she returned to Colorado; the relationship ended and J.Z. and M.C. stopped communicating. As a result, M.C. was unaware of the twins' birth.

¶ 5 Prior to the births, J.Z. selected T.W. and A.W., who were clients of petitioner Adoption Choices of Colorado, Inc. ("Adoption Choices"), a licensed child placement agency, as the twins' adoptive parents. The day after giving birth, J.Z. completed a petition for expedited relinquishment of her parental rights pursuant to section 19–5–103.5. In the supporting documents, she provided only a first name for the twins' father and stated that she did not know his last name or contact information. She made the same representations to Adoption Choices. Based on this information, Adoption Choices filed a petition to terminate the parent-child relationship between the father and the twins. Following the statutory procedure, the trial court terminated the birth mother's and the then-unknown father's parental rights. The adoptive parents were present at the births and took the twins home from the hospital. They filed a petition to adopt on October 10, 2012. On December 18, 2012, nine days before the finalized adoption, a friend of the birth mother sent M.C. a message on Facebook telling him that J.Z. had given birth to twins and placed them for adoption. The court then entered the final Adoption Decree on December 27, 2012, and T.W. and A.W. became the legal parents of the twins. The twins still live with the adoptive parents.

¶ 6 In February 2013, approximately two months after M.C. found out he was a father,

---

1. Specifically, we granted certiorari on the following four issues:

    1. Whether the court of appeals erred in its application of a special presumption in favor of the birth father to Colorado's statutory procedure and criteria for termination of parental rights set forth in section 19–5–105.
    2. Whether the court of appeals erred in holding that adoptive parents had no cognizable rights or interests in this action.
    3. Whether the court of appeals erred in holding that the trial court abused its discretion in only considering biological father's one payment of child support during a three-

    month period in determining whether he has taken "substantial responsibility" for the children.
    4. Whether the court of appeals erred in failing to consider the needs and interests of the children in its analysis and interpretation of section 19–5–105.

2. The *Troxel* presumption assumes that fit, natural parents act in the best interests of their children. 530 U.S. at 68, 70, 120 S.Ct. 2054. It requires reviewing courts to accord some "special weight" to the parents' child-care determinations and to articulate special factors when deciding against the parents' determinations. *Id.*

M.C. filed for relief from the judgment terminating his parental rights pursuant to C.R.C.P. 60(b)(2), alleging that he was the twins' father and that he had not received notice of the relinquishment. Genetic testing confirmed that M.C. was the biological father. In March, the court granted M.C.'s and Adoption Choices' motions to join as indispensable parties and permitted the adoptive parents to intervene in the relinquishment and termination proceeding.

¶ 7 Pursuant to the motion for relief, the court held a hearing in May 2013, and found that J.Z. had committed fraud (without T.W. and A.W.'s knowledge) that violated M.C.'s due process rights by failing to disclose M.C.'s full identity and contact information to Adoption Choices and, ultimately, to the court. As a result, in June the court voided the termination of M.C.'s parental rights in a written order. *See* § 19–5–105(4); *In re C.L.S.*, 252 P.3d 556, 558 (Colo.App.2011) ("[B]ecause mother knew father's identity, her fraudulent failure to disclose this information to the court resulted in the termination of his parental rights without due process, and therefore the judgment terminating his rights by default is void."). The court also continued the June trial dates regarding the possible termination of M.C.'s parental rights to October 2 and 3, 2013, to allow more time for discovery, and it gave the adoptive parents temporary custody of the twins. The order instructed the parties to "confer and arrange visitation for [M.C.] with the children not less than two eight hour periods per week." At the request of the adoptive parents at a status conference on June 27, the court modified M.C.'s parenting time to shorter periods of shared and solo time with the twins, which gradually increased from two hours to up to four hours every Saturday and Sunday.

¶ 8 M.C.'s first visit with the children occurred on June 29, 2013, and he had approximately twenty visits with them between June and October. Because M.C. continued to live in Iowa, he spent money on travel and lodging when he visited. He also provided the twins with food, gifts, and clothing during these visits. He testified that he spent between $1,800 and $2,500 a month to travel to see the children and to provide for them during his visits. At the June status conference, the court informally suggested that the parties should consider the issue of child support. The parties disputed whether the adoptive parents had to disclose their financial information before M.C. could provide child support. As a result, the court never entered a formal child support order pursuant to section 14–10–115, C.R.S. (2015). Subsequently, M.C. made a one-time child support payment of $250 two weeks before the October trial date.

¶ 9 In August 2013 the court appointed a guardian ad litem ("GAL") "to investigate any and all matters pertaining to the best interests of the children and the possible termination of [M.C.'s] parental rights pursuant to [section] 19–5–105(3), (3.1), and (3.2)." Ten days prior to the October trial dates, the GAL submitted her report, which stated that T.W. and A.W. were "extraordinary" parents and that the twins were "clearly securely attached to [them]." The report also mentioned that M.C.'s actions were not "objectionable" and that there was "no indication that [he] is or would be an unfit parent," but that he was "naïve about the needs of his children" and did not understand that the twins viewed T.W. and A.W. as their parents and were attached to them. After determining that the twins' attachment was of "utmost importance" in evaluating their best interests, the GAL recommended that M.C.'s parental rights be terminated.

¶ 10 The court held a two-day trial in October 2013 to decide whether M.C.'s parental rights should be terminated.[3] In making its determination, the court recognized that M.C. was entitled to a presumption that biological parents have a first and prior right to custody of their children, but that the presumption may be rebutted by clear and convincing evidence of certain statutory factors under section 19–5–105, including that the children's best interests would be better served by granting custody to the nonparent. *See* § 19–5–105(3.1), (3.2). After applying

---

**3.** On August 15, 2013, the court formally dismissed J.Z. from the proceedings because her legal rights had been terminated the previous September.

this presumption and the statutory criteria for termination of the parent-child legal relationship in relinquishment and adoption proceedings, the court terminated M.C.'s parental rights. In its order, the court concluded that the presumption had been rebutted by clear and convincing evidence, and that terminating M.C.'s parental rights and awarding custody to the adoptive parents was in "the best interests of the child[ren]." *See id.* In so doing, the court found that M.C. (1) had "not promptly taken substantial parental responsibility for the children" because he had "failed to pay regular and reasonable support for the care of the child[ren]," and (2) had "not established a substantial, positive relationship with the children." *See* § 19–5–105(3.1)(b), (c).

¶ 11 In concluding that M.C. had not established a substantial relationship with or taken substantial responsibility for the children, the court rejected M.C.'s affirmative defense that his failure to do so was "due to impediments created by the other parent or person having custody."[4] Specifically, M.C. contended at trial that he only failed to pay regular and reasonable support for the twins' care because T.W. and A.W. did not disclose their financial information. The court found, however, that M.C. could have taken financial responsibility by paying child support without knowing T.W. and A.W.'s financial information. It further found that the adoptive parents had not impeded M.C. from establishing a relationship with the twins when they challenged visitation time because both sides acted in what they believed were the twins' best interests and "exercised what they believed to be their respective legal positions through counsel."

¶ 12 Finally, although the court "principally" relied on its findings and conclusions as they related to section 19–5–105, it considered the fundamental liberty interests of the parties, including the best interests of the

children, the state's interests, and the adoptive parents' interests. The court stated that these interests were not the "governing factor" in its final decision but nevertheless articulated that the adoptive parents' interests in having the children remain with them and the children's interests in staying with the only parents they had known outweighed M.C.'s interests as a birth parent. In particular, the court stated that because "the children's best interests are paramount," their interest in remaining with the adoptive parents by itself outweighed M.C.'s interests.

¶ 13 M.C. appealed, and the court of appeals reversed, holding that the trial court's analysis did not adequately protect M.C.'s fundamental right as a birth parent to make decisions for the children. *M.C.,* ¶¶ 31–32. Specifically, the court of appeals held that the trial court erred in (1) not fully considering M.C.'s fundamental liberty interest in the care, custody, and control of his children as articulated in *Troxel*; (2) not analyzing the children's best interests standard in light of the father's parental rights; and (3) finding clear and convincing evidence of two of the factors in section 19–5–105(3.1).[5] *M.C.,* ¶¶ 27–32, 64–102. In reversing the trial court, the court of appeals applied the United States Supreme Court's decision in *Troxel,* which concerned a Washington visitation statute. *Id.* at ¶ 81; *Troxel,* 530 U.S. at 63, 120 S.Ct. 2054. Interpreting the language in *Troxel,* 530 U.S. at 68–69, 120 S.Ct. 2054, the court of appeals held that the trial court erred "in failing to accord 'special weight' to father's determination that the children's best interests would be served by placing them in his custody, as required under *Troxel,* and in failing to identify the 'special factors' justifying rejection of his determination." *M.C.,* ¶¶ 81, 85. It also determined that the adoptive parents, the twins, and the state lacked liberty interests in this case and thus the trial court erred in balancing these interests and determining that they out-

---

4. M.C. had asserted the affirmative defense provided in section 19–5–105(3.3), which excuses a parent from failing to take responsibility for, or establish a substantial relationship with, his or her child if the child is under one year old and the parent shows by a preponderance of the evidence that the other biological parent or the custodial parents created an impediment.

5. Only one of those statutory factors—whether M.C. had not promptly taken substantial parental responsibility for the children—is before us on appeal. § 19–5–105(3.1)(c).

weighed M.C.'s parental rights. *Id.* at ¶¶ 33–62, 86.

¶ 14 Based on these conclusions, the court of appeals held that the trial court did not properly apply section 19–5–105 in terminating M.C.'s parental rights and failed to consider the presumptions articulated in *Troxel. M.C.*, ¶¶ 71–102. The court of appeals concluded that the trial court abused its discretion when it determined that M.C. did not demonstrate an affirmative defense to the allegation that he failed to establish a substantial, positive relationship with the twins.[6] *Id.* at ¶¶ 87–96. The court held that there is no "best interests" exception to this affirmative defense and thus concluded that the adoptive parents impeded M.C.'s ability to establish a relationship by delaying and challenging the visitation schedule. *Id.* at ¶¶ 94–96. As to whether M.C. promptly took substantial responsibility for the children, the court of appeals determined that the trial court should have considered all of the expenses M.C. incurred, including toys, food, clothing, and litigation costs, and M.C.'s attempts to work with T.W. and A.W. to determine child support. *Id.* at ¶¶ 97–102. Overall, the court of appeals rejected the trial court's conclusion "that if the best interests of the children would be served by granting custody of the children to [T.W. and A.W.], then the best interests of the children would also be served by termination of [M.C.'s] parental rights." *Id.* at ¶ 79.

¶ 15 The adoptive parents and Adoption Choices filed separate petitions for certiorari review. We consolidated the petitions and granted certiorari.

## II. Standard of Review

■ ¶ 16 The trial court's decision to terminate M.C.'s parental rights under section 19–5–105 presents mixed questions of fact and law. We defer to the trial court's findings of fact if they are supported by the evidence and review the court's conclusions

of law de novo. *In re B.J.*, 242 P.3d 1128, 1132 (Colo.2010).

## III. Analysis

¶ 17 We begin our analysis by acknowledging the emotional hardship this case presents. The record shows that neither M.C. nor the adoptive parents are at fault and that none of them would be bad parents. We recognize the trial court's statement that it could not "recall a more difficult decision during its many years on the bench." Furthermore, we agree with the GAL, who highlighted the challenging nature of the case:

> This has been a very difficult [case]. There are no bad actors. [M.C.] wants to be a good father to his children and his motives are sincere.... [T.W. and A.W.], too, are truly innocent victims of a tragic situation. They have been ideal parents and no child could expect better care. The children are in fact quite fortunate that a lot of people love them.

Despite this difficulty, we must make a determination adverse to one party. We granted certiorari to review the court of appeals' reinstatement of M.C.'s parental rights.

¶ 18 To resolve this case, we first analyze *Troxel* and determine that the court of appeals erred when it found that the trial court violated M.C.'s due process rights by failing to apply the *Troxel* presumption. Rather, we hold that the trial court in this case satisfied *Troxel's* heightened due process requirements when it terminated M.C.'s parental rights. We also hold that the trial court did not abuse its discretion in considering only M.C.'s single child support payment when it concluded that he did not take "substantial responsibility" for the twins, and that the record supports the trial court's decision to terminate M.C.'s parental rights under section 19–5–105.[7]

### A. The Trial Court Satisfied the *Troxel* Presumption

■ ¶ 19 The applicability of *Troxel* to parental termination proceedings is an issue

---

6. Whether M.C. had "established a substantial, positive relationship with the child[ren]" and whether the adoptive parents prevented M.C. from establishing that relationship are not before us on appeal.

7. Because we uphold the trial court on statutory grounds, we do not address the liberty interests of the intervenors, the state, or the children in this case.

of first impression for this court. However, it is not necessary to determine whether *Troxel* applies to parental termination proceedings generally because in this case, the trial court afforded M.C. *Troxel's* heightened due process requirements. The trial court sufficiently protected M.C.'s fundamental liberty interest in his children because it applied a presumption in favor of preserving parental rights and made findings, required under section 19–5–105, to overcome this presumption by clear and convincing evidence.

¶ 20 We begin our analysis by recognizing that the right to parent one's children is a fundamental liberty interest. The right to raise one's own children is "essential," *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and "far more precious than any property right," *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Thus, M.C. unquestionably has due process rights stemming from his fundamental liberty interest in the care, custody, and control of his children. In *Santosky,* the U.S. Supreme Court articulated that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child" requires "fundamentally fair procedures." *Id.* at 753–54, 102 S.Ct. 1388. Although its facts are quite different from the instant case, *Santosky* is helpful here because it elucidates parents' due process rights regarding the care and custody of their children.

¶ 21 *Santosky* considered New York's permanent neglect statute, which permitted the court to terminate the natural parents' rights to their child if the state proved by a "fair preponderance of the evidence" that the child was permanently neglected according to the statutory criteria. *Id.* at 748–49, 102 S.Ct. 1388. In addressing whether the preponderance of the evidence standard was constitutionally sufficient, the Court noted that natural parents retain a fundamental liberty interest in their children even if they are not currently parenting those children: "If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." *Id.* at 753, 102 S.Ct.

1388. The Court in *Santosky* ultimately concluded that states must apply at least a "clear and convincing evidence" standard to guarantee due process in parental termination proceedings and protect parents' fundamental interests in the care, custody, and control of their children. *Id.* at 769–70, 102 S.Ct. 1388.

¶ 22 Subsequently, the Supreme Court reaffirmed these fundamental parental rights in *Troxel.* It stated that such parental rights are "perhaps the oldest of the fundamental liberty interests" that the Court has recognized. *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054. *Troxel* concerned the limits of a state's ability to override the parenting decisions of fit parents in the specific context of third-party visitation rights. *Id.* at 62–63, 120 S.Ct. 2054. In *Troxel,* the Court struck down Washington's "breathtakingly broad" nonparental visitation statute. *Id.* at 67, 120 S.Ct. 2054. The Washington statute allowed *any* person to file a petition for visitation with someone else's children and permitted a court to grant the petition based solely on the court's own estimation of the children's "best interests." *Id.* Moreover, it did not require the court to give the parent's visitation decision "any presumption of validity or any weight whatsoever." *Id.*

¶ 23 After stating that the lower court in *Troxel* did not base its decision on "any special factors that might justify the State's interference" with the parent's decisions regarding her children, the Court went on to state that there is a presumption that "fit parents act in the best interests of their children." *Id.* at 68, 120 S.Ct. 2054. According to *Troxel,* then, the trial court's failure to apply a presumption in favor of the natural parent improperly denied that parent due process with respect to her parental rights. In striking down the statute, the Court emphasized that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72–73, 120 S.Ct. 2054. In sum, *Troxel* stands for the proposition that states may not overrule parental decisions without giving those decisions "special weight," *id.* at 70,

120 S.Ct. 2054, and considering "special factors that might justify the State's interference," *id.* at 68, 120 S.Ct. 2054.

¶ 24 *Troxel* and *Santosky* give form to the long-standing tenet that parents have a fundamental liberty interest in the care, custody, and control of their children, which courts must presume to be valid. *Troxel* creates a presumption in favor of natural parents and adds that there must be special factors that justify the state interfering with parental rights, while *Santosky* holds that the state must overcome this presumption and find those special factors by clear and convincing evidence. There is no clarification of what "special factors" in particular the court must consider when terminating parental rights, and no requirement that courts state that they are applying *Troxel*. Neither case held that courts must track the language in the case exactly; rather, they were meant to emphasize the importance of parental rights. Thus, taken together, *Santosky* and *Troxel* give direction to courts when entering orders that affect parental rights. The cases state that courts may interfere with parents' liberty interests in their children only if there is clear and convincing evidence of special factors that justify doing so.

¶ 25 The trial court in this case applied a presumption in favor of M.C. and made findings under section 19–5–105 that overcame and rebutted the presumption by clear and convincing evidence. In doing so, it followed *Troxel's* and *Santosky's* guidelines. The trial court emphasized that "Colorado Courts recognize a presumption that the biological parent has a first and prior right to custody" which can be rebutted only if the evidence shows that the best interests of the children would be served by granting custody to a third party. *See In re Custody of C.C.R.S.,* 892 P.2d 246, 256 (Colo.1995). This language shows that the trial court presumed that M.C. should retain his parental rights and that M.C. was acting in the best interests of his children in his attempt to gain custody. It is analogous to *Troxel's* language stating that "there is a presumption that fit parents act in the best interests of their children." 530 U.S. at 68, 120 S.Ct. 2054. Thus, although the trial court did not track *Troxel's*

language exactly, it applied the necessary presumption in favor of M.C.

¶ 26 Having determined that the trial court applied the requisite presumption in favor of M.C., we must now consider whether section 19–5–105 adequately protects M.C.'s due process rights. Thus, we turn to the statute to answer that question.

## B. Section 19–5–105 Adequately Protects a Parent's Due Process Rights

¶ 27 We conclude that section 19–5–105, along with the presumption in favor of M.C., meets *Santosky's* and *Troxel's* due process requirements, and therefore the trial court in this case satisfied M.C.'s due process rights. *Troxel* is silent as to what "special factors" would be sufficient to overcome the presumption in favor of a fit parent. To determine what the plurality of the Court meant by the term "special factors," it is important to note that the dispute in *Troxel* concerned a statute that allowed any person at any time to petition the court for visitation rights. The Court concluded that the statute's "sweeping breadth" and the unlimited power it gave to the state made the statute, as applied, unconstitutional. *Id.* at 73, 120 S.Ct. 2054. In so doing, it noted that the statute limited neither who could petition for visitation rights nor the circumstances in which the court could grant such a petition. *Id.* Specifically, the Court noted that neither the statute nor the trial court's order was founded on any special factors that might justify the state's interference with the parent's decision. Thus, the *Troxel* Court's "special factors" are meant to be specific reasons why state intervention is warranted.

¶ 28 As such, a statute authorizing state intervention into the parent-child relationship satisfies *Troxel's* "special factors" requirement when it compels the trial court to make specific factual findings that justify the state's intervention. Section 19–5–105 requires those findings. It lists specific factual findings that a court must make before terminating parental rights, including the parents' failure to promptly take responsibility for their children and the best interests of the children. The statute's criteria thus constitute special factors that, when combined

with the presumption in favor of M.C., satisfy *Troxel's* due process requirements.

¶ 29 In addition, all of the statutory factors must be proved by clear and convincing evidence. "Due process requires that the state support its allegations by at least clear and convincing evidence" before a state may "sever" a parent from his child. *Santosky*, 455 U.S. at 747–48, 102 S.Ct. 1388; *see also People ex rel. A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) (stating that the termination of parental rights is a decision of "paramount gravity"). Consistent with the Supreme Court's direction, we adopted the clear and convincing standard "in proceedings involving termination of a parent-child relationship." *People ex rel. A.M.D.*, 648 P.2d 625, 631 (Colo. 1982) (holding that the clear and convincing standard must apply in terminating the parent-child relationship after the children have been adjudicated dependent or neglected). In *A.M.D.*, this court interpreted Colorado's parental rights termination statute, which is now contained in section 19–5–105. Section 19–5–105(1) states that "[i]f one parent relinquishes or proposes to relinquish or consents to the adoption of a child, the agency or person having custody of the child shall file a petition in the juvenile court to terminate the parent-child legal relationship of the other parent...." Because the trial court in this case determined that the birth mother's fraud voided the termination of M.C.'s parental rights, the statutory criteria in subsections (3.1) through (3.3) governed the status of his restored parental rights. These subsections detail when courts may order termination of the nonrelinquishing birth parent's parental rights.

¶ 30 Subsection (3.1) specifies two criteria that must be met for a court to order the termination of the nonrelinquishing birth parent's parental rights. First, the court must find that "termination is in the best interests of the child[ren]." § 19–5–105(3.1).

Second, the court must find "that there is clear and convincing evidence" of at least one of three enumerated bases. *Id.* The first two bases laid out in subsection (3.1) are not before us on appeal.[8] The remaining basis is if the parent has not "promptly taken substantial parental responsibility for the child." § 19–5–105(3.1)(c). Under that provision, the court may consider a nonexhaustive list of three factors. The only factor applicable to this appeal is whether the birth father "failed to pay regular and reasonable support for the care of the child[ren], according to that parent's means."[9] § 19–5–105(3.1)(c)(II).

¶ 31 Additionally, subsection (3.3) provides an affirmative defense to allegations that the nonrelinquishing parent failed to take substantial responsibility for the children under subsection (3.1). To successfully assert the defense, the nonrelinquishing parent bears the burden of showing, by a preponderance of the evidence, that the other birth parent or the custodial parents created an impediment. § 19–5–105(3.3).

¶ 32 Finally, subsection (3.2) states that, when determining whether to terminate parental rights, "the court shall give paramount consideration to the physical, mental, and emotional conditions and needs of the child[ren]." § 19–5–105(3.2). In doing so, the court must take into account three specific factors related to the children's attachment to their physical custodians: (1) "whether the child[ren] ha[ve] formed a strong, positive bond with the child[ren]'s physical custodian[s]"; (2) how long that bond has existed; and (3) "whether removal of the child[ren] from the physical custodian would likely cause significant psychological harm to the child[ren]." *Id.*

¶ 33 We conclude that this statutory scheme adequately protects M.C.'s due process rights. Specifically, section 19–5–105 protects M.C.'s due process rights by ensuring that the state does not infringe parental

---

**8.** These bases concern (1) whether the nonrelinquishing parent is unfit and (2) whether the parent "has not established a substantial, positive relationship with the child." § 19–5–105(3.1)(a)–(b).

**9.** The other two factors in subsection (3.1)(c) are: (I) whether the parent is served with notice and

fails to answer or fails to file a paternity action within the required time limit and (III) whether the father has failed to "substantially assist" the mother in paying costs associated with the pregnancy and birth of the child, according to his means. § 19–5–105(3.1)(c)(I), (III).

rights "simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 U.S. at 73, 120 S.Ct. 2054. It constrains judges' discretion and mandates that the party seeking termination prove certain factors before the court may terminate parental rights. Significantly, the court must find all of those factors by clear and convincing evidence. Hence, this statutory scheme is consistent with the U.S. Supreme Court's due process requirements as laid out in *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388, and *Troxel*, 530 U.S. at 67–69, 120 S.Ct. 2054.

¶ 34 Having determined that section 19–5–105 adequately protects parents' due process rights, we next examine whether the trial court abused its discretion when it found that M.C.'s parental rights should be terminated under the statute.

## C. The Trial Court Did Not Abuse Its Discretion When It Terminated M.C.'s Parental Rights

¶ 35 In terminating M.C.'s parental rights, the trial court made detailed findings pursuant to the statutory criteria in section 19–5–105. In particular, the trial court found that M.C. "failed to pay regular and reasonable support" for the twins' care. M.C. argues that the trial court abused its discretion in making this finding. We disagree. "Findings of fact are generally reviewed under a clear error or abuse of discretion standard...." *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo.2000). We conclude that the trial court did not abuse its discretion in making this finding and that this finding supports the ultimate legal determination that M.C. failed to promptly take substantial parental responsibility for the children. *See* § 19–5–105(3.1)(c). We therefore hold that terminating M.C.'s parental rights and awarding custody to T.W. and A.W. is in the twins' best interests.

## 1. Failure to Promptly Take Substantial Parental Responsibility for the Children

¶ 36 One basis for termination of parental rights under section 19–5–105(3.1) is "[t]hat the parent has not promptly taken substantial parental responsibility for the

child." § 19–5–105(3.1)(c). Here, we are concerned with only one of the three factors listed for consideration: "[w]hether the parent has failed to pay regular and reasonable support for the care of the child...." § 19–5–105(3.1)(c)(II). As to this factor, the trial court found that M.C. made only one payment of $250 for child support after it restored his parental rights in June 2013. Additionally, he made that one payment only two weeks prior to the October 2013 termination hearing. The court also stated that M.C.'s other expenses in facilitating his visits—travel, food, clothing, toys, car seats, and a stroller—"did not go directly to the daily care of the children" and thus do not count as support. After reviewing the trial court's findings, we conclude that the court did not abuse its discretion in finding that M.C. had failed to pay regular and reasonable support for the twins' care according to his means. § 19–5–105(3.1)(c)(II).

¶ 37 Section 19–5–105(3.1)(c)(II) can be broken into three parts: (1) "pay regular and reasonable support," (2) "for the care of the child," and (3) "according to that parent's means." While the statute does not define its terms, we assume that the legislature intended to give each term its plain and ordinary meaning. *Roup v. Commercial Research, LLC*, 2015 CO 38, ¶ 8, 349 P.3d 273, 276. We read the statute's language in context to give effect to all parts. *Reno v. Marks*, 2015 CO 33, ¶ 20, 349 P.3d 248, 253. With this in mind, we interpret the provision's terms.

¶ 38 First, section 19–5–105(3.1)(c)(II) begins with the phrase "pay regular and reasonable support." "Support," while not defined in the statute, refers to expenditures that are used for the necessary, everyday care of the children. *See* Webster's New Int'l Dictionary 2297 (3d ed. 2002) (defining "support" as "to pay the costs of" and "to provide a basis for the existence or subsistence of"). These expenditures include basics such as clothing, shelter, food, and medical care. Furthermore, young children, such as the twins in this case, require additional expenditures, including age-appropriate furniture, food, and diapers.

¶ 39 In addition, the adjectives "regular" and "reasonable" in section 19–5–105(3.1)(c)(II) provide parameters for assessing support. "Regular" support for the care of the children means consistent support over a period of time. This definition recognizes that children have ongoing expenses related to their care. "Reasonable" support for the care of the children, likewise, is what ordinary parents would need to spend for the care of their children under their individual circumstances. *See* Black's Law Dictionary 1379 (9th ed. 2010) (defining "reasonable" as "proper[ ] or moderate under the circumstances").

¶ 40 Second, the support must be "for the care of the child." Child support is a right that belongs exclusively to the child. *McQuade v. McQuade,* 145 Colo. 218, 358 P.2d 470, 472 (Colo.1960). Therefore, the support must go to the children's daily care and cannot be used for expenditures made for the parent. Third, the use of the phrase "according to that parent's means" evinces the legislature's understanding that parents have different resources available and that courts should consider a parent's means when scrutinizing the reasonableness of the payments.

¶ 41 Here, the parties disagree on which expenditures fall under the statute. At issue are M.C.'s one child support payment of $250, his litigation expenses in this case, his travel expenses to and from visits, and his purchases of food, clothing, toys, car seats, and a stroller, all of which he used during those visits. We examine these expenditures under section 19–5–105(3.1)(c)(II).

¶ 42 M.C.'s one child support payment was a payment in support of the twins that went to their care, as required by the statute. Nevertheless, one payment of $250 is not "regular." In the approximately three months between the date his parental rights were restored and the termination hearing, M.C. provided a single payment. Hence, he did not meet the ongoing needs of his two children. Additionally, the payment was not "reasonable." Reasonable support is based on what it costs to provide care for a child coupled with what a parent can afford to pay. A reasonable parent, under M.C.'s individual circumstances, would not conclude that one payment of $250 in three months would cover the cost of caring for two young children. Significantly, the trial court found that M.C. had the financial means to provide additional support and noted that M.C.'s parental rights were reestablished for nearly three months before he made the one support payment. Thus, the trial court did not err when it found that M.C.'s single payment of $250 was neither regular nor reasonable. Moreover, the trial court correctly determined that no impediment prevented M.C. from providing more support. The trial court reasoned that because the adoptive parents had no legal obligation to provide their financial information, their refusal to provide the information was not an impediment. Additionally, the court correctly noted that a formal child support determination was not required for M.C. to provide support. *See In re I.R.D.,* 971 P.2d 702, 705 (Colo.App.1998) (rejecting the argument of non-abandonment in a termination of parental rights case where the father argued that he did not fail to provide reasonable support because the mother was wealthy and had neither sought, nor been awarded, child support) (citing *In re Petition of Martensen,* 129 Colo. 125, 267 P.2d 658 (Colo.1954)).

¶ 43 Because the statute states that the support should be provided "according to the parent's means," the facts that the adoptive parents did not provide their financial information and that there was no court order for child support do not excuse M.C. from providing more support. What T.W. and A.W. earn is irrelevant. Unlike the child support guidelines statute, § 14–10–115, section 19–5–105(3.1)(c) requires neither consideration of the custodial parents' financial resources nor a comparison of the parties' incomes. Section 14–10–115 is inapplicable because the guidelines are meant to "[c]alculate child support based upon the parents' combined adjusted gross income estimated to have been allocated to the child if the parents and children were living in an intact household" and apply specifically to "proceeding[s] for dissolution of marriage, legal separation, maintenance, or child support." § 14–10–115(1)(b)(I), (2)(a). Hence,

M.C.'s argument that he should be excused from paying fails because T.W. and A.W.'s refusal to provide their financial information did not create an impediment. *See* § 19–5–105(3.3).

¶ 44 In contrast to child support payments, M.C.'s litigation expenses and travel expenses, while substantial, did not go to "the care of the child[ren]." Moreover, if courts considered litigation costs as going to the care of the children, it would give inappropriate weight to the cost of legal services while shifting focus away from direct, parent-child support. Likewise, M.C.'s travel expenses did not go to the care of the children. M.C. provided for the twins' care *during* his visits, not by traveling to see them.

¶ 45 As to the other expenses, such as food, clothing, toys, car seats, and a stroller, the trial court found that these expenses were "items to facilitate [M.C.'s] visits" with the twins that "did not go directly to the daily care of the children." The evidence presented at trial supports that finding. The expenditures related to visiting the twins, in combination with the single child support payment, did not rise to the level of "regular and reasonable support." § 19–5–105(3.1)(c)(II). Additionally, the trial court's finding that M.C. failed to provide regular and reasonable support was not "manifestly arbitrary, unreasonable, or unfair" and was "within a range of reasonable options." *Churchill v. Univ. of Colo.*, 2012 CO 54, ¶ 74, 285 P.3d 986, 1008 ("In assessing whether a trial court's decision is manifestly unreasonable, arbitrary, or unfair, we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options.") (quoting *E–470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo.App.2006)).

¶ 46 Finally, the trial court's finding that M.C. did not provide regular and reasonable support for the twins' care supports the conclusion that he failed to "promptly take[ ] substantial parental responsibility" for the twins. Thus, we agree with the trial court's conclusion that based on its findings under the clear and convincing evidence standard, M.C. failed to promptly take substantial parental responsibility.

¶ 47 Having established that at least one of the prongs of section 19–5–105(3.1) has been met, the statute now requires that we review whether the twins' best interests are served by terminating M.C.'s parental rights and allowing them to remain with the adoptive parents.

## 2. The Children's Best Interests

¶ 48 As a preliminary matter, we conclude that the court of appeals misconstrued section 19–5–105(3.6) when it held that the trial court erred by permitting the adoptive parents to present evidence of the children's best interests and their suitability as a placement for the children at the termination hearing. *M.C.*, ¶ 105. This section, which specifies intervenors' right to present evidence regarding their relationship with the children and what is in the children's bests interest, states:

> Except for a parent whose parental rights have been relinquished pursuant to section 19–5–104, a person who has or did have the child in his or her care *has the right to intervene as an interested party* and to present evidence to the court regarding the nonrelinquishing parent's contact, communication, and relationship with the child. If custody is at issue pursuant to subsection (3.4) of this section, such person also has the right to present evidence regarding the best interests of the child and his or her own suitability as a placement for the child.

§ 19–5–105(3.6) (emphasis added). The court of appeals reasoned that intervenors may present evidence of the children's best interests and their suitability for placement only under subsection (3.4), which governs what happens if the nonrelinquishing parent's parental rights are not terminated. *M.C.*, ¶ 105. It stated that intervenors are limited at the termination hearing to presenting evidence regarding the parent's contact, communication, and relationship with the children. *Id.*

¶ 49 The court of appeals' reading of subsection (3.6) is too narrow. First, we have stated that "to 'intervene' means to become a party to the litigation." *A.M. v.*

A.C., 2013 CO 16, ¶ 16, 296 P.3d 1026, 1032 (citing *Black's Law Dictionary* 897 (9th ed. 2009)). Intervenors "who meet the required statutory criteria to intervene may participate fully in the termination hearing without limitation." *Id.* at ¶ 20, 296 P.3d at 1033 (construing section 19–3–507(5)(a), C.R.S. (2012), which concerned people's rights to intervene in dependency and neglect cases, to mean that foster parents may intervene with full-party status without violating parents' due process rights). Second, restricting intervenors' ability to present evidence regarding the children's best interests would inhibit the fact-finding responsibility of the court. "The overriding purpose of the Children's Code is to protect the welfare and safety of children in Colorado by providing procedures through which their best interests can be ascertained and served." *Id.* at ¶ 10, 296 P.3d at 1030. If intervenors were prohibited from presenting evidence on the children's best interests, then the court could be without evidence that is relevant to a fact it must determine. Third, subsection (3.6) states that custodians have "the right to intervene as [ ] interested part[ies] *and* to present evidence to the court regarding the nonrelinquishing parent's contact, communication, and relationship with the child[ren]." § 19–5–105(3.6) (emphasis added). In order to give meaning to the right to intervene as we have previously construed it, we cannot read subsection (3.6) as limiting what evidence may be permitted. Therefore, because subsection (3.6) states that a custodian has the right to participate as a party (which necessarily includes presenting evidence on the children's best interests) the trial court correctly permitted the adoptive parents to present evidence on the children's best interests and future placement.

▆ .¶ 50 Having made this preliminary determination, we turn to the trial court's conclusion regarding the twins' best interests. We see no error. The trial court applied the correct legal standard and made detailed findings concerning the twins' best interests. In doing so, it concluded, based on clear and convincing evidence, that terminating M.C.'s parental rights and awarding custody to the adoptive parents would best serve the twins' interests.

¶ 51 Section 19–5–105(3.2) sets forth the standard for terminating parental rights. Subsection (3.2) requires the state to consider the bond between the children and their physical custodian and the harm that would result from severing that relationship when determining the child's best interests in termination proceedings:

> In considering the termination of a parent's parental rights, the court shall give paramount consideration to the physical, mental, and emotional conditions and needs of the child. Such consideration shall specifically include whether the child has formed a strong, positive bond with the child's physical custodian, the time period that the bond has existed, and whether removal of the child from the physical custodian would likely cause significant psychological harm to the child.

§ 19–5–105(3.2); *see also* § 19–1–102(1.6), C.R.S. (2015) ("The general assembly recognizes the numerous studies that children undergo a critical bonding and attachment process prior to the time they reach six years of age."). The legislature's language indicates that it recognized the importance of the bonds between children and their caregivers and how these bonds are essential to not only the early emotional development of children, but also their ability to form healthy relationships throughout their lives.

¶ 52 In making extensive factual findings under subsection (3.2),[10] the trial court found by clear and convincing evidence that the twins had a strong, positive bond with, and were securely attached to, their adoptive parents. *See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("[T]he importance of the familial relationship ... stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children." (second alteration in original) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231–33, 92

---

**10.** The court of appeals did not address this subsection in its review but instead focused on the effect of *Troxel* on proceedings to terminate parental rights. *M.C.*, ¶¶ 83–85.

S.Ct. 1526, 32 L.Ed.2d 15 (1972))). In addition, the adoptive parents were successfully meeting the physical, emotional, and psychological needs of the twins. More importantly, the trial court found that the adoptive parents "are for all practical purposes both their psychological and actual parents." While M.C. testified that the children should be in his custody because he is their biological father and, as a black man, he can help the twins with problems they may face as mixed-race children, extensive testimony from the GAL, the adoptive parents, and their expert supports the trial court's finding that the twins are securely attached to the adoptive parents and their best interests would be served by remaining in their present home.

¶ 53 In contrast, the trial court found that no such bond existed between the twins and M.C. It noted that while M.C.'s visits had "established familiarity" with the twins, there had not been "meaningful contact" and the twins did not see M.C. as a parental figure. Rather, the court found that M.C.'s relationship with the twins was "transitory rather than substantial."

¶ 54 Most significantly, the trial court, after weighing the experts' opinions on a possible transition from the adoptive parents to M.C., found that "it is certain" that the twins' removal from the adoptive parents "will cause them significant psychological harm."[11] In so doing, the court recognized that the GAL and both parties' experts agreed that the twins would likely experience psychological harm if the twins were removed from the adoptive parents and were placed with M.C., and that both the GAL and T.W. and A.W.'s expert believed that a change in custody would result in "trauma" and "psychological harm." Because the experts testified that the quality of the care after a possible transfer would be critical in coping with any psychological harm, the court examined M.C.'s approach and transition plan. It found that

while M.C. testified that he and his fiancée had tentative plans for the twins, such as day care while they are at work, the plans for a nanny fell through, and he had nothing planned to reduce the psychological impact from a possible change in custody. It also found that M.C. "ha[d] not fully appreciated the [twins'] strong attachment to [T.W. and A.W.] and the psychological trauma that they would experience by removal" and had no specific plan to deal with this trauma. Because the court also found that M.C.'s plans for meeting the twins' "physical, mental, and emotional needs are somewhat unclear," it doubted M.C.'s ability to meet the twins' needs and ease the psychological impact that a change in custody would likely entail. *See Broncucia v. McGee*, 173 Colo. 22, 475 P.2d 336, 337 (Colo.1970) (articulating that the weight of the evidence is within the province of the trial court).

¶ 55 We conclude that clear and convincing evidence supported the trial court's finding that terminating M.C.'s parental rights was in the twins' best interest. The twins are securely attached to their adoptive parents— the only parents they have known. They have never had a meaningful relationship with M.C. Most importantly, the court found that a change in custody would cause the twins significant psychological harm. Thus, these findings, to which this court must give "paramount consideration," support the conclusion that terminating the parent-child relationship between M.C. and the twins is in the twins' best interests. § 19–5–105(3.2).

¶ 56 In conjunction with terminating M.C.'s parental rights, the trial court examined whether remaining in the adoptive parents' custody was in the twins' best interests. In so doing, the court again applied the presumption that biological parents have a first and prior right to custody. *See C.C.R.S.*, 892 P.2d at 256. It also recognized, again, that this presumption may be rebutted if evidence shows that the child's best inter-

---

11. In assessing subsection (3.2), the trial court stated that:

> Perhaps the most significant issue in this case is whether removal of the children from [T.W. and A.W.] and placement with [M.C.] will likely cause them significant psychological harm. Actually, the [GAL] and [the expert witnesses] all agree (although using different terminology) that it can be expected that such a change of custody would be highly stressful, or traumatic, and cause psychological harm. They only disagree as to the extent and duration of that harm.

ests are better served by granting custody to the third party. *Id.* After applying the presumption in favor of M.C., the trial court ultimately determined that the children's best interests require that the twins remain in the custody of the adoptive parents. Specifically, it found that, "[d]espite the extremely unfortunate manner in which the circumstances of this case arose (in which neither [T.W. and A.W.] or [M.C.] are responsible), and despite the fact that [M.C.] is not unfit, and despite the fact that he has a strong desire to have custody of these children," the "presumption in favor of [M.C.]" was overcome and rebutted by clear and convincing evidence.

¶ 57 As with the termination decision, we conclude that clear and convincing evidence supports the trial court's decision that awarding custody to the adoptive parents would best serve the twins' interests. While M.C. has the prior right to custody, the evidence as found by the trial court rebuts this presumption. We do not conclude that M.C. is unfit, but the evidence shows that the twins are "thriving" in the adoptive parents' care and that "there will be significant psychological harm if they are removed from their current custody [with T.W. and A.W.]." Hence, the trial court's findings support the conclusion that remaining in the adoptive home would serve the twins' best interests.

¶ 58 Accordingly, we conclude that the twins' best interests are served by terminating M.C.'s parental rights and keeping the twins in the adoptive parents' custody. The adoptive parents brought the twins home from the hospital after their birth and have been caring for them for their entire lives. As a result, the twins are securely attached to their adoptive parents, and the children should remain in the adoptive home.

## IV. Conclusion

¶ 59 We agree with the court of appeals that M.C. has a liberty interest in the care, custody, and control of his children; however, we hold that the court of appeals erred in concluding that the trial court violated M.C.'s due process rights by failing to apply the presumption articulated in *Troxel.* Rather, the trial court satisfied *Troxel's* heightened due process requirements when it terminated his parental rights in this case. Furthermore, we hold that the trial court did not abuse its discretion in considering only M.C.'s single child support payment when it concluded that he did not take "substantial responsibility" for the children, and that the record supports the trial court's ultimate decision to terminate M.C.'s parental rights. Accordingly, we reverse the court of appeals and remand the case for further proceedings consistent with this opinion.

JUSTICE EID dissents, and JUSTICE COATS joins in the dissent.

JUSTICE MÁRQUEZ does not participate.

JUSTICE EID, dissenting.

¶ 1 Today the majority affirms the trial court's termination of M.C.'s parental rights based on the insufficiency of his $250 payment to the adoptive parents during the three months following the restoration of his rights. If this seems like an exceedingly slim reed upon which to base a termination of parental rights order, that is because it is. The reed becomes even slimmer considering the trial court "informally" raised the issue of child support but never settled a dispute over whether the adoptive parents were required to disclose financial information to set the amount of child support; in other words, the issue was never formally settled. Because the issue of child support was not resolved by the trial court, the trial court had no basis on which to determine that M.C. failed to "promptly" take "substantial parental responsibility" as required for termination by section 19–5–105(3.1)(c), C.R.S. (2015). Moreover, our case law requires that "[i]n order to provide a [termination] procedure that is fundamentally fair," the trial court must also consider whether the parent is likely to pay child support in the future. *In re R.H.N.,* 710 P.2d 482, 487 (Colo.1985). Here, the trial court performed no such analysis; if it had, it would have concluded that M.C. would pay child support once the issue was formally determined. Finally, while the majority hedges its bets on whether *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147

L.Ed.2d 49 (2000) (plurality opinion), applies to this case, *see* maj. op. ¶ 19 (assuming, without deciding, that *Troxel* applies and concluding that it is satisfied), its entire analysis is beside the point. The problem here is not whether the trial court failed to give "special weight" to M.C.'s parenting decisions, as was the case in *Troxel*, 530 U.S. at 70, 120 S.Ct. 2054, but rather whether M.C.'s parental rights should be terminated. In this context, our statute imposes two requirements: (1) clear and convincing evidence that the parent failed to promptly take substantial responsibility for his child; and (2) that the best interests of the child be served. § 19–5–105(3.1). As the court of appeals correctly determined, where there is an insufficient showing of the former, the parent's rights are impermissibly terminated based on the conclusion that the child would be "better off" being raised by someone else. *M.C. v. Adoption Choices of Colo., Inc.*, 2014 COA 161, ¶ 80, 2014 WL 6485660. For these reasons, I respectfully dissent.

¶ 2 Section 19–5–105(3.1) allows the trial court to terminate a birth parent's parental rights if such termination is in the child's best interests and there is clear and convincing evidence that "the parent has not promptly taken substantial parental responsibility for the child." One of the factors to consider in this inquiry is whether "the parent has failed to pay regular and reasonable support for the care of the child, according to that parent's means." § 19–5–105(3.1)(c)(II). Here, as the majority recognizes, the trial court "informally" raised the issue of child support. Maj. op. ¶ 8. This informal suggestion led to a "disput[e] [over] whether the adoptive parents had to disclose their financial information" in order to set the amount of support. *Id.* But the trial court never settled this dispute, nor did it enter a formal child support order. *Id.* The first time the issue was formally addressed by the trial court was when it determined that M.C.'s parental rights should be terminated due to non-payment. The majority finds that non-payment is a legitimate ground on which to base a termination order because the statute specifies that child support should be paid according to a parent's means, not according to the adoptive parents' financial need. Maj.

op. ¶ 43. The majority adopts an appropriate reading of the statute, but entirely misses the point. The trial court "informally" raised the issue of child support, leading to an expectation that the issue would be "formally" determined at a later point. Indeed, after the court's informal action, a dispute between the parties arose over whether the adoptive parents were required to disclose financial information before the issue could be resolved. Instead of settling the dispute, the trial court used M.C.'s non-payment as the grounds for termination. Under these circumstances, the trial court had no basis to conclude that M.C. failed to promptly take substantial parental responsibility for his children.

¶ 3 More importantly, the inquiry into whether a parent has provided adequate support is not only backward-looking, it is forward-looking as well. As we held in the analogous context of stepparent adoptions, "In order to provide a procedure that is fundamentally fair, once a court has determined that a natural parent has failed to provide child support . . . the court must look beyond the [period of non-payment] to determine whether there is any likelihood that the natural parent will provide child support." *R.H.N.*, 710 P.2d at 487; *see also E.R.S. v. O.D.A.*, 779 P.2d 844, 848 (Colo.1989) (court must consider, prior to termination of parental rights, whether it is "unlikely" that parent will pay child support in the future). This forward-looking component is meant to ensure that the parent-child relationship is preserved where possible. *Cf. D.P.H. v. J.L.B.*, 260 P.3d 320, 324 n. 2 (Colo.2011) (approving of *In re J.D.K.*, 37 P.3d 541, 544 (Colo.App. 2001), which refused to extend *R.H.N.* to the abandonment context because there was no relationship to preserve). The trial court in this case examined M.C.'s behavior only during the three months between the restoration of his parental rights and the termination hearing. But had the trial court inquired whether M.C. was likely to pay child support once the issue was settled, there was absolutely no indication that M.C. would fail to make child support payments in the future. Indeed, he made a $250 payment two weeks prior to the hearing, and there was over-

whelming evidence that he was committed to establishing a relationship with, and regaining custody of, his children once his parental rights had been restored.

· ¶ 4 Finally, I cannot agree with the majority's constitutional analysis, which assumes, without deciding, that *Troxel* applies, and then provides a lengthy discussion of why the dictates of that case have been met, if they did in fact apply. I believe the majority's constitutional analysis is simply a red herring. *Troxel* concerned a trial court decision that failed to give "special weight" to a parent's parental decisions—in that case, regarding grandparent visitation. 530 U.S. at 70, 120 S.Ct. 2054. This case involves a much more fundamental determination—namely, whether a parent's parental rights should be terminated. The issue here is thus dictated by our termination statute. Where, as here, there is insufficient evidence to support the determination that a parent has failed to take substantial responsibility for his children, parental rights are terminated based solely on the "best interests of the child" analysis, meaning that, as the court of appeals observed, termination is based on the fact that the children would be "better off" being raised by someone else. *M.C.,* ¶ 80. Because the majority perpetuates the trial court's error in this regard, I respectfully dissent from its opinion.

I am authorized to state that JUSTICE COATS joins in this dissent.